**MASSACHUSETTS FURNITURE & PIANO MOVERS ASSOCIATION, INC., Petitioner,**

v.

**FEDERAL TRADE COMMISSION, Respondent.**

No. 83–1892.

United States Court of Appeals, First Circuit.

Sept. 30, 1985.

James C. McMahon, Jr., New York City, with whom Rory J. Fitzpatrick, Boston, Mass., Lori Samet Schwartz and Brodsky, Linett, Altman, Schechter & Reicher, New York City, were on brief, for petitioner.

Peter B. Ellis, Gerald L. Neuman, and Foley, Hoag & Eliot, Boston, Mass., on brief, for the Bekins Co. and Bekins Moving & Storage Co., Inc., amici curiae.

John H. Carley, Gen. Counsel, Washington, D.C., with whom Howard E. Shapiro, Deputy Gen. Counsel, Ernest J. Isenstadt, Asst. Gen. Counsel, Joanne L. Levine, Atty., and Leslie Rice Melman, Atty., F.T.C., Washington, D.C., were on brief, for respondent.

Before COFFIN and BREYER, Circuit Judges, and DOYLE,* Senior District Judge.

COFFIN, Circuit Judge.

The Massachusetts Furniture and Piano Movers Association (the Association) appeals from a decision of the Federal Trade Commission (FTC) ordering the Association to cease and desist from collective rate setting. Appellant is a Massachusetts trade association comprised of two hundred and seventy carriers of household goods and office equipment, a number equal to approximately eighty percent of such carriers in Massachusetts. Since 1938, the Association has followed the practice of developing "tariffs", or price schedules, for its members and filing these tariffs with the Massachusetts Department of Public Utilities (MDPU). In 1977 the FTC began an investigation of this practice. It concluded that the Association's rate-setting activities violated Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, and it ordered the Association to cease filing joint tariffs. In light of *Southern Motor Carriers Rate Conference, Inc. v. United States*, —— U.S. ——, 105 S.Ct. 1721, 85 L.Ed.2d 36 (1985), we reverse in part, vacate in part, and remand.[1]

Massachusetts law requires a mover to file a tariff with the MDPU setting the mover's rates and conditions for service. The MDPU may reject a proposed tariff; but if it takes no action within a certain period (usually thirty days), the tariff automatically becomes effective. Mass.Gen. Laws Ann. ch. 159B, § 6. The regulations promulgated by the MDPU permit one mover to adopt another mover's tariff by filing a concurrence. MDPU 10405(1), Part III, § 6(b). The MDPU does not, however, require common carriers to file joint tariffs or to adopt uniform rates.

The Association's Tariff Committee develops a comprehensive tariff that sets out two tables of rates for packing and unpacking services, ten tables of hourly rates for moves of 25 miles or less, and a table of rates calculated by weight and mileage for moves of more than 25 miles. This tariff is approved by the Association's Board of Directors and ratified by the members. Although members of the Association have

---

* Of the Western District of Wisconsin, sitting by designation.

1. Final decision in this appeal was deferred pending the Supreme Court's resolution of *Southern Motor Carriers,* and on our request, the parties submitted supplemental briefs to address the relevance of that case to the present action. The Commonwealth of Massachusetts submitted an *amicus* brief in support of the FTC, and Ticor Title Insurance Co., along with five other title insurance companies, filed an *amicus* brief in support of the Association.

the right to file independent tariffs, the Administrative Law Judge (ALJ) who rendered the initial decision in this case found that the right was rarely exercised. Indeed, between 1972 and 1980, the average participation in the Association's tariff was greater than ninety-five percent.

The ALJ also found that the Association organizes member carriers into geographic zones and encourages carriers in each zone to adopt uniform rates, or to move uniformly to a higher rate table within the Association's tariff. The ALJ indicated that the Association "acts as a fire brigade which at the first sign of a price reduction rushes into action to discourage such competitive activity." In addition, the ALJ found that the Association "serves as a constant source of inspirational messages to the members which have as their dominant theme that movers should increase prices to consumers."

In response to the FTC's charge that its rate-setting practices constitute an unfair method of competition, the Association argues that the FTC's conclusion is not supported by substantial evidence, and that the Association's practices are immune from the antitrust laws under the "state action" doctrine of *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). Amici Bekins Company and Bekins Moving & Storage Company argue that the FTC does not have jurisdiction to regulate the purely intrastate activities of the Association.[2]

## I. Jurisdiction

The Interstate Commerce Act (ICA) expressly reserves the regulation of common carriers' intrastate rates to the states, even where these rates affect interstate commerce. 49 U.S.C. § 10521(b). *Southern Motor Carriers*, 105 S.Ct. at 1723 n. 1. The ICA also confers statutory immunity from the operation of the federal antitrust laws to approved *inter*state collective rate bureau activity. 49 U.S.C. § 10706.[3] Amici argue that as applied to them these provisions of the ICA irreconcilably conflict with the federal antitrust laws and thereby warrant an implied repeal of the antitrust laws for *intra*state rate bureau activity. Intervention by the FTC or any federal administrative agency in this situation, they contend, offends Congress's clear policy to refrain from exercising its power to regulate intrastate trucking. Significantly, they argue, no provision of the Federal Trade Commission Act explicitly confers on the FTC the authority to intervene in intrastate rate-making processes.

The Supreme Court has repeatedly stated that:

"Repeals of the antitrust laws by implication from a regulatory statute are strongly disfavored, and have only been found in cases of plain repugnancy between the antitrust and regulatory provisions." *United States v. Philadelphia National Bank*, 374 U.S. 321, 350–51 [83 S.Ct. 1715, 1734, 10 L.Ed.2d 915] (1963), *quoted in Otter Tail Power Co. v. United States*, 410 U.S. 366, 372 [93 S.Ct. 1022, 1027, 35 L.Ed.2d 359] (1973).

The presumption against implied repeal, normally applied to conflicts between federal antitrust laws and federal regulations, applies with equal force to conflicts involving state regulatory policy. *Cantor v. Detroit Edison Co.*, 428 U.S. 579, 596–97 & nn. 36, 37, 96 S.Ct. 3110, 3120–21 nn. 36, 37, 49 L.Ed.2d 1141 (1976). And even

**2.** The Bekins companies also argue that the FTC's order violates their First Amendment right to petition the government under the *Noerr-Pennington* doctrine by prohibiting the Association from coordinating discussions among competing carriers, and by prohibiting the maintenance of tariff committees to consider rates. The Association did not make this overbreadth argument before the Commission or on appeal to this court. We therefore decline to reach this issue and decide the case "in the context in which it was decided below and argued here." *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 104 S.Ct. 1464, 1469–70 n. 7, 79 L.Ed.2d 775 (1984).

**3.** 49 U.S.C. § 10706 is the recodification of Section 5a of the *Interstate Commerce Act*, also known as the Reed-Bulwinkle Act. The act provides that interstate carriers may apply to the Interstate Commerce Commission for approval of a joint rate-making agreement.

**394**

where such repugnancy is found, the antitrust laws are abrogated only to the extent necessary for the effective functioning of the regulatory scheme. *Silver v. New York Stock Exchange,* 373 U.S. 341, 357, 83 S.Ct. 1246, 1257, 10 L.Ed.2d 389 (1963).

We find no irreconcilable conflict of federal antitrust policy as embodied in Section 5 of the Federal Trade Commission Act with either the Interstate Commerce Act, 49 U.S.C. §§ 10521(b), 10706, or with the existence of state regulation. First, the Association concedes that it is not a "common carrier" subject to the ICA and the provisions of that act do not govern even those of the Association's actions which affect interstate commerce. The Interstate Commerce Act therefore poses no bar to the application of the federal antitrust laws to collective intrastate rate making.

Second, despite the reservation to the states of the regulation of intrastate trucking, nothing in the provisions of the ICA or its legislative history demonstrate congressional intent to renounce any or all federal antitrust regulation in the field. Amici contend that Congress implicitly immunized intrastate price fixing from the antitrust laws by deleting from the 1980 amendments to the Interstate Commerce Act a provision prohibiting regional rate bureaus from handling rates for intrastate transportation. The legislative history reveals, however, that this provision was not retained in the final version of the act because Congress determined that further study was necessary, and not because Congress approved intrastate rate bureau activities. *See* H.R.Rep. No. 96–1069, 96th Cong., 2d Sess. 29 (1980), U.S.Code Cong. & Admin.News 1980, 2283, 2311. The Interstate Commerce Act did not deprive the states of the power to regulate intrastate motor carriers, but neither did it create an exemption from the federal antitrust laws for that state regulated activity. Absent a statutory exemption, or state created immunity, *see post,* the collective preparation

or filing of intrastate motor carrier rates which affect interstate commerce is subject to federal regulation.

Likewise, we refuse to imply an exemption from antitrust regulation from the Federal Trade Commission Act because nothing in that statute reflects congressional intent to withhold from the FTC the power to oversee intrastate rate-making activities. To the contrary, we think that Section 201(a) of the Magnuson-Moss Act, Pub.L. 93–637, 88 Stat. 2183 (codified in scattered sections of 15 U.S.C.), which extends the reach of Section 5 of the FTCA from acts "in commerce" to acts "in or affecting commerce" supports our conclusion that the FTC has jurisdiction to regulate the intrastate activities of the Association which affect interstate commerce.[4]

## II. *State Action Immunity*

The Supreme Court ruled in *Southern Motor Carriers Rate Conference v. United States* that the collective intrastate rate making of a private motor carrier conference was immunized from antitrust liability under the "state action" doctrine of *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943) (the Sherman Act was not intended to prohibit states from imposing restraints on competition, and will not be used to compromise the states' ability to regulate their domestic commerce). 105 S.Ct. 1721. The Court reasoned that state action immunity existed because the private parties' conduct was undertaken pursuant to "clearly articulated and affirmatively expressed" state policies to displace competition, and the anticompetitive activity was "actively supervised" by the respective states, *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.,* 445 U.S. 97, 105–06, 100 S.Ct. 937, 943, 63 L.Ed.2d 233 (1980) *(Midcal).* *Southern Motor Carriers,* 105 S.Ct. at 1729. In applying the *Midcal* test in *Southern Motor Carriers,* the Supreme Court resolved first that the *Midcal* reasoning is appropriate

**4.** The Association does not dispute that its intrastate rate-making activities affect interstate commerce.

even where the named defendant is a private party, *id.* at 1728 ("The success of an antitrust action should depend upon the nature of the activity challenged, rather than on the identity of the defendant"), and second, that state compulsion of private anticompetitive conduct is not required to satisfy the first prong of *Midcal, id.* ("The federal antitrust laws do not forbid the States to adopt policies that permit, but do not compel, anticompetitive conduct by *regulated* private parties" (emphasis in original)).

The Supreme Court analyzed the statutes of the states which participated in the rate bureaus, North Carolina, Georgia, Tennessee and Mississippi. With the exception of Mississippi, the statutes explicitly permit, without compelling, collective rate making by the common carriers.[5] The Court concluded, therefore, that these states had "clearly articulated and affirmatively expressed" a policy to displace competition for intrastate rate setting. Because the parties conceded the presence of active state supervision, the second prong of the *Midcal* test, the Court concluded that the collective intrastate rate-making activity of North Carolina, Georgia and Tennessee was entitled to *Parker* immunity. *Id.* at 1731.

In contrast, the Mississippi statute lacks language explicitly authorizing collective

ratesetting. Nevertheless, the Court found that the statute clearly embodied that state legislature's intent to displace price competition among common carriers with a regulatory structure because the Mississippi Motor Carrier Regulatory Law of 1938, Miss.Code Ann. § 77–7–1 *et seq.* (1972 and Supp.1984), gives the state Public Service Commission authority to regulate common carriers and requires the Commission to prescribe "just and reasonable" rates for the intrastate transportation of general commodities, § 77–7–221. *Southern Motor Carriers,* 105 S.Ct. at 1730. The Court concluded:

"[T]he Mississippi Public Service Commission is not authorized to choose free-market competition. Instead, it is required to prescribe rates for motor common carriers on the basis of statutorily enumerated factors. Miss.Code Ann. § 77–7–221 (1972). These factors bear no discernible relationship to the prices that would be set by a perfectly efficient and unregulated market. Therefore, the Mississippi statute clearly indicates that the legislature intended to displace competition in the intrastate trucking industry with a regulatory program." *Id.* at 1731 n. 25.

The language of the Mississippi statute is remarkably close to that of Mass.Gen. Laws Ann. ch. 159B.[6] As in Mississippi,

---

**5.** *See e.g.,* Tenn.Code §§ 65–501, 65–1520; Rule .40, Chapter 1220–2–1 of the Rules of the Tennessee Public Service Commission:

"The rules and regulations governing the agreements between or among two or more carriers relating to rates, fares, ... or procedures for the joint consideration, initiation, or establishment thereof *as set forth by the Inter*state Commerce Commission ... are hereby adopted by the Tennessee Public Service Commission; providing, however, that the final determination on any rates, fares, classifications, divisions, allowances, charges ... shall be left in its final determination to the Tennessee Public Service Commission."

**6.** The relevant portions of Ch. 159B are Sections 1, and 6:

"§ 1. Policy

It is hereby declared to be the policy of the commonwealth to regulate transportation of property by motor carriers upon its ways in such manner as to recognize and preserve the

inherent advantages of such transportation, and to foster sound economic conditions in such transportation and among carriers engaged therein in the public interest; and in connection therewith to: (1) Promote adequate, economical and efficient service by motor carriers, and reasonable charges therefor, without ... unfair or destructive competitive practices,...."

§ 6. Rates and charges; tariffs; rules and regulations

Every common carrier by motor vehicle shall publish and file with the department and keep open for public inspection tariffs....

Every such common carrier shall establish, observe and enforce just and reasonable rates, charges and classifications and reasonable regulations and practices relating thereto, which shall become effective ... at least thirty days after the filing of the tariff ... unless suspended by the department prior to its effective date upon complaint of any person.

there is a state regulatory agency in Massachusetts which sets motor common carriers' rates for the intrastate transportation of household goods and that agency exercises ultimate authority and control over all intrastate rates. In both states, common carriers are required to submit proposed rates to the relevant commission for approval; proposed rates become effective if the state agency takes no action within a specified period of time, or after a hearing, upon affirmative agency approval; and, while every common carrier remains free to submit individual rate proposals to the regulatory agency, common carriers are allowed to agree on rate proposals, and to jointly submit their proposals to the regulatory agency.

The Association argues that the Court in *Southern Motor Carriers* relied solely upon the language of the Mississippi statute to conclude that Mississippi had a policy to displace competition among intrastate carriers. The similarity of the Mississippi and Massachusetts statutes, they argue, mandates the reversal of the FTC's finding of antitrust violation in order to conform to the outcome of *Southern Motor Carriers.* The FTC argues to the contrary, that the Supreme Court in *Southern Motor Carriers* relied on evidence of legislative intent detailed in the State of Mississippi's Response as *Amicus Curiae,* in addition to statutory and regulatory language, to reach its conclusion regarding Mississippi. The FTC claims that where a state does not itself intend to displace competition, as the Commonwealth contends in its *amicus* brief, it would be absurd to conclude, relying only upon the language of the statute,

that there was a clear state policy to promote anticompetitive behavior. Moreover, the FTC argues, both the Commission and the ALJ applied the *Midcal* standard to the facts of this case and found that the Association failed to establish a clearly articulated Massachusetts policy to promote anticompetitive behavior.

■ We agree with the Association on this issue. The Court in *Southern Motor Carriers* concluded that for purposes of the first prong of *Midcal,* a clearly articulated policy is one that has been approved by a state legislature or a state supreme court. 105 S.Ct. at 1730. Although the Court referred to Mississippi's *amicus* brief in its opinion, it did so only to describe the nature and functioning of the Mississippi regulatory scheme. *Id.* at 1724, 1730. When trying to adduce the legislature's intent to regulate intrastate motor carriers, the Court referred only to the Mississippi statute, concluding that its permissive language had received the sanction of the state and was sufficient to satisfy the first prong of *Midcal. Id.* at 1730–31. Therefore, faced with Mass.Gen.Laws Ann. ch. 159B, and language that is comparable to that of the Mississippi statute, we conclude, notwithstanding Massachusetts's claims in its *amicus* brief to the contrary, that Chapter 159B clearly establishes the state's intent to countenance collective rate setting among motor carriers. We note moreover that even were we to consider evidence of legislative intent beyond the statutory and regulatory language discussed, the Commonwealth's claim that its statutes and regulations evidence a neutral

organization or body politic, or by the department on its own motion; . . . .

The department, upon complaint of any common carrier by motor vehicle or of any other person, or upon its own motion, after hearing, may allow or disallow any filed or existing rates and may alter or prescribe the rates of common carriers in . . . accordance with the legal standards provided in this chapter. . . . The department shall annually establish reasonable maximum and minimum rates or charges consistent with industry and economic conditions and consistent with the declaration of policy contained in section one.

In the exercise of the power to prescribe just and reasonable rates . . . the department shall give due consideration, among other factors, to the inherent advantages of transportation by such carrier, to the effect of any rates under consideration upon the movement of traffic by such carriers, to the need in the public interest of adequate and efficient transportation service by such carriers, to the cost of service and to the need of revenues sufficient to enable such carriers under honest, economical and efficient management to provide such service."

policy toward collective rate making is not the type of authority which could supplant the clear meaning of the statute. Accordingly, the Association met its first burden in establishing *Parker* immunity.[7]

In order to be immunized from antitrust liability under *Parker*, the Association must also satisfy the second prong of the *Midcal* test—that the anticompetitive activity was "actively supervised" by the state. Because the ALJ and the Commission concluded that the Association failed to satisfy the first prong of *Midcal*, thus requiring a conclusion of no *Parker* immunity, they did not fully consider whether Massachusetts has supervised the level of trucking rates actively enough to meet the second prong of *Midcal*.[8] Because we conclude, in light of *Southern Motor Carriers*, that the Association did meet its first burden in establishing *Parker* immunity, there is now a need for definitive factual findings on the active supervision requirement. Accordingly, we remand this case to the Commission for full consideration of the active supervision prong of the *Midcal* test.[9] The Commission's order that the Association cease and desist its tariff and collective rate-making activities is therefore

*Reversed in part, vacated in part, and remanded for further proceedings in accordance with this opinion.*

---

**7.** We are not bound by the fact findings below on this point because they were made before the Supreme Court clarified its view of the "state policy" component of the *Midcal* test in *Southern Motor Carriers*.

**8.** The ALJ stated in his initial decision that he did not "make a definitive factual finding as to how vigorously the MDPU exercises its statutory power to review proposed joint tariffs for reasonableness." Appendix, Vol. 1, p. 32. He stat-

ed that he did not make such a finding because "proof on this point [was] not germane to [his] decision". *Id.*

**9.** The Supreme Court did not expand upon its interpretation of the legal and factual requirements of the "active supervision" prong in *Southern Motor Carriers* because the parties conceded its satisfaction.