**NEW ENGLAND MOTOR RATE BUREAU, INC., Petitioner,**

v.

**FEDERAL TRADE COMMISSION, Respondent.**

**No. 89–1963.**

United States Court of Appeals, First Circuit.

Heard March 6, 1990.

Decided July 20, 1990.

Bryce Rea, Jr., with whom Patrick McEligot, William E. Kenworthy, Leo C. Franey and Rea, Cross & Auchincloss, Washington, D.C., were on brief for petitioner.

Frederick E. Dooley with whom Jay C. Shaffer, Acting General Counsel, and Ernest J. Isenstadt, Asst. General Counsel, Washington, D.C., were on brief for respondent.

Before CAMPBELL, Chief Judge, COFFIN and BOWNES, Senior Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

New England Motor Rate Bureau, Inc. ("NEMRB") petitions this court for review of a cease and desist order of the Federal Trade Commission ("FTC"). The opinion of

the FTC in this case appears as *New England Motor Rate Bureau, Inc.*, 112 F.T.C. ____, Docket No. 9170, slip op. (Aug. 18, 1989). Our jurisdiction over this petition derives from 15 U.S.C. § 45(c).

At issue is whether Massachusetts' supervision of motor carrier rates is sufficiently active to immunize NEMRB—the motor carriers' private rate-making bureau—from the federal antitrust laws.

Massachusetts, like other states and federal agencies, regulates rates through a so-called negative option process, *viz.* rates are required to be formulated and published by the carriers or their agent (i.e., here, NEMRB) and filed with a regulatory agency having ultimate rate-setting powers (here, the Massachusetts Department of Public Utilities ("MDPU")). The filed rates become legally binding unless rejected or suspended within a period of time by the agency. Under Massachusetts law, motor carrier rates must be non-discriminatory and "just and reasonable," and the MDPU is charged by law with enforcing compliance with these criteria. To this end, it has extensive power to suspend, reject or modify rates using hearing, investigatory and complaint procedures. However, the MDPU has not in recent history rejected any of the rates filed by NEMRB nor held hearings or investigations. Because of this, the FTC ruled that Massachusetts failed the "active supervision" prong of the Supreme Court's two-prong test for determining whether a regulated activity qualifies for "state action" immunity. NEMRB now challenges the FTC's finding, contending that Massachusetts' comprehensive regulatory scheme and MDPU's regulatory activities meet the "active supervision" requirement.

## PROCEEDINGS BELOW

On October 24, 1983, the FTC issued a complaint alleging that NEMRB, its members, officers, and directors, had engaged in a conspiracy to fix prices in violation of 15 U.S.C. § 45 by collectively formulating and filing rates for the transportation by motor carrier of commodities moving within the states of Massachusetts, New Hampshire, Rhode Island, and Vermont. This conspiracy and these activities were alleged to have deprived motor carriers, shippers and consumers in the four states of the benefits of free and open competition. Petitioner raised various defenses, including that its collective rate-making activity was "state action," immune from federal antitrust challenges under the state action doctrine first enunciated in *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). The Administrative Law Judge (ALJ) who heard the case disallowed all defenses except the state action defense, which he held in abeyance until this court could hand down a decision in a pending appeal, *Mass. Furniture & Piano Movers Association v. FTC*, 773 F.2d 391 (1st Cir. 1985). In *Mass. Furniture*, we ruled that because Mass.Gen.L. ch. 159B (1986) "clearly establishes Massachusetts' intent to countenance collective rate setting among motor carriers," the relevant carrier trade association satisfied the first prong of the test for *Parker* immunity set out in *California Retail Liquor Dealers Association v. Midcal Aluminum, Inc.*, 445 U.S. 97, 105–06, 100 S.Ct. 937, 943–44, 63 L.Ed.2d 233 (1980): namely, that a private party's conduct be undertaken pursuant to "clearly articulated and affirmatively expressed" state policies to displace competition. While upholding the state action defense thus far, we noted that the Association need also meet *Midcal*'s second prong, *viz.* "that the anticompetitive activity was 'actively supervised' by the state." *Mass. Furniture*, 773 F.2d at 397. We remanded to the FTC for findings on the active supervision requirement. *Id.*

Following the decision in *Mass. Furniture*, the ALJ in the FTC proceeding below disallowed NEMRB's defense that its collective rate filing activity in Massachusetts was state action, hence immune from the federal antitrust laws. While he accepted *Mass. Furniture*'s ruling that the governing state law met *Midcal*'s first prong, *supra*, he found that Massachusetts' regulation of the filed rates was, in practice, too passive to satisfy *Midcal*'s "active supervision" requirement. The ALJ also disallowed the state action defense in New

Hampshire as well, finding that rate regulation by New Hampshire authorities failed both aspects of the *Midcal* test. In Rhode Island, however, the ALJ upheld NEMRB's rate-making activities as immune. He concluded that Rhode Island's regulatory supervision was active enough to make NEMRB's collective rate filings with the Rhode Island Public Utilities Commission a form of protected state action.[1] The FTC adopted the ALJ's findings, with one Commissioner dissenting as to the finding that NEMRB's Massachusetts rate filings were not entitled to "state action" immunity. NEMRB now seeks our review of the FTC's holding that Massachusetts state regulation is, in practice, too passive to immunize NEMRB's rate filings under the state action doctrine.[2]

## FACTS

### 1. *The Nature and Functioning of NEMRB*

Petitioner NEMRB is a Massachusetts nonprofit organization composed of competing common (motor) carriers that service customers in New England. It develops and files collective tariffs and tariff supplements governing interstate and intrastate rates and commodity classifications within Massachusetts, New Hampshire, Rhode Island, and, formerly, Vermont. Collective tariffs are initiated and developed by NEMRB's General Rate and Classification Committee, consisting of officers or employees of the carrier members of NEMRB. Tariff proposals approved by the Committee are filed with the official regulatory agencies of each of the four states and sent to all members of NEMRB.[3] The carrier members of NEMRB ratify its tariff proposals at annual meetings, and formally acquiesce in such tariffs by granting to NEMRB a power of attorney with respect to such filings.

In neither Massachusetts, New Hampshire, nor Rhode Island are common carriers *required* to file joint tariffs or to cooperate in their establishment. A carrier may, if it wishes, file its own proposed rates. However, in each jurisdiction, carriers are permitted to utilize a filing agent and to adopt and participate in a tariff filed by an agent or another carrier. If a carrier does elect to participate in a tariff filed by another carrier or by an agent such as NEMRB, the carrier is obliged by law to adhere to the specified rates once the tariff becomes effective.

### 2. *The Nature and Functioning of Massachusetts' Regulatory System*

As explained in greater detail later in this opinion, Massachusetts regulates common carriers by motor vehicle, and their rates, according to a comprehensive regulatory scheme that gives to the MDPU authority, *inter alia*, to license common carriers and to prescribe and alter their rates. Carriers are required to adhere to their filed rates, which Massachusetts law provides must be nondiscriminatory, just and reasonable. The MDPU is controlled by three full-time commissioners appointed by the Governor. Mass.Gen.L. ch. 25, § 2 (1986). The Massachusetts motor carrier statute, including its rate provisions, is enforced by the MDPU's transportation division headed by a director. *Id.* § 12F.

---

**1.** After the complaint was issued, the state of Vermont deregulated the intrastate transportation of freight, and NEMRB ceased to formulate and file rates applicable to Vermont. Complaint counsel moved to dismiss the complaint with respect to NEMRB's activities in Vermont, and the Administrative Law Judge granted that motion.

**2.** The decision of the FTC with regard to New Hampshire is not being appealed. The New Hampshire statute at the time of the FTC decision required carriers to file their rates; and such rates were to be nondiscriminatory, but the statute did not require that they be just and reasonable. Subsequently, the statute was amended to require the rates of motor carriers of property to be just and reasonable. The state is also now engaged in establishing policies and procedures to implement the revised statutory framework. NEMRB says that it may seek revision of the FTC order as soon as the new regulatory framework is in place.

**3.** Rates are also filed with the federal Interstate Commerce Commission with respect to interstate shipments. Federal law recognizes the right of rate bureaus to formulate and file collective rates for members, exempt from antitrust laws. 49 U.S.C. § 10706(b).

The following picture of the Massachusetts regulatory apparatus was provided by stipulations the ALJ accepted for purposes of this proceeding. The MDPU employs one rate analyst to review NEMRB rate filings.[4] The rate analyst has never requested financial information to support a tariff nor rejected a rate because it was too high or too low. However, if confronted with a tariff containing rates that in his judgment were out of line with the average rates that have been established in a particular pricing zone or seem extraordinarily high—such as a 20 percent to 50 percent increase—the Massachusetts rate analyst would recommend suspension and investigation of the tariff by the MDPU Commissioners. The same would hold true if the tariff appeared to contain discriminatory provisions. Moreover, the law provides for the MDPU to hold a hearing upon the complaint of any common carrier by motor vehicle or of any other person or upon the MDPU's own motion. The MDPU will investigate any complaint alleging a violation of the statute or any order, rule or regulation issued thereunder, and will take action that is warranted in response to a violation. Rates go into effect automatically 30 days after they are filed unless the rate analyst has recommended rejection or suspension before the end of the 30-day period. It is the stipulated opinion of the rate analyst that whenever tariffs become effective without rejection, suspension or a hearing, that action results from a determination that the proposed rates meet the regulatory criteria of the Massachusetts statute and regulations pertaining to motor carriers of property (i.e., that such rates be just and reasonable, *infra*).

In Massachusetts, NEMRB files general rate restructures, general rate increases, and supplements thereto that have been previously filed with the federal Interstate Commerce Commission (ICC). NEMRB accompanies such filings with a justification statement that has been filed with the ICC. If the ICC suspends the proposal, NEMRB requests the MDPU to postpone the effective date of the proposal in Massachusetts pending the outcome of the ICC investigation. At the conclusion of the ICC investigation, NEMRB requests the MDPU to take the same action with respect to the intrastate Massachusetts proposal. The ICC has traditionally regulated rates under a (now-superseded) federal statutory directive that they be "just and reasonable," 49 U.S.C. § 316 (1963)[5], language identical to that used in the Massachusetts law. *See* Mass.Gen.L. ch. 159B § 6, ¶ 2 (1986). Generally, the MDPU relies on the fact that the ICC has already conducted an investigation and reached a conclusion as to the justness and reasonableness of the NEMRB proposals.

Aside from its role in reviewing proposed rates, MDPU does not monitor economic conditions in the intrastate trucking industry. It has never conducted a study of the industry nor of the effects of state regulatory policy upon it, nor does anyone at the MDPU look behind the filed rates to determine whether they accurately reflect a carrier's profit and costs.

## FTC HOLDING

In finding that NEMRB's collective filings in Massachusetts were not immunized from federal antitrust liability under the "state action" doctrine, the FTC majority concluded that the MDPU's past record of regulatory activity had been too passive. Thus, even though NEMRB's collective rate-setting activities on behalf of motor carriers were an authorized and accepted part of the Massachusetts scheme, the FTC concluded that they were just another instance of forbidden private, anti-competitive conduct. It reached a different result in Rhode Island, however, because it found that regulatory action in Rhode Island was somewhat more aggressive.

---

4. MDPU also employs 12 inspectors who have police power to enforce Massachusetts' motor carrier statutes. One of their duties is to spot check carriers to investigate complaints that they are not charging the rates they have filed. Stipulation 72 of August 28, 1986.

5. In 1978 the language of the federal statute was changed from "just and reasonable" to "reasonable" for clarity, consistency, and to conform to modern usage. *See* 49 U.S.C. § 10701(a) (1990) and accompanying "Historical and Statutory Notes." No change in the meaning of the statutory language was intended. *Id.*

In Massachusetts, the FTC noted the absence of specific rate hearings and other active rate review proceedings conducted by the state relative to the rates filed by NEMRB. Only where clerical errors had been found had the MDPU actually rejected rate filings. The MDPU did not audit carriers' records or monitor economic conditions in the industry; had never requested financial data from carriers to support collectively set rates; and had never rejected a filing because of the price to be charged. The Commission concluded from this that the MPDU allowed tariffs to go into effect automatically, without inquiring into their substance, ensuring only that "the collective tariffs satisf[ied] formalistic format requirements." 112 F.T.C. ___, Docket No. 9170, slip op. at 20 (Aug. 18, 1989). Such purely "ministerial" review, the FTC found, did not amount to active supervision. Because, under the second prong of the *Midcal* test, the state action defense cannot apply in the absence of active state supervision, the FTC held that NEMRB's activities in Massachusetts, as well as in New Hampshire, were unfair methods of competition in violation of 15 U.S.C. § 45 (i.e., collective price-setting by horizontal competitors). On the basis of these findings, the FTC issued a cease and desist order.

## COMMISSIONER AZCUENAGA'S DISSENT

The dissenting commissioner disagreed that the MDPU's regulatory activity was too slight to qualify as active state supervision. She noted that the FTC had found NEMRB rate-making activities in Rhode Island to qualify for application of the state action defense, and reasoned that similar NEMRB activities in Massachusetts should also have been found to qualify because the facts relating to active supervision were virtually identical in the two states. She saw few factual differences between the rate regulatory systems in Massachusetts and Rhode Island, and thought that the differences that did exist were not significant. One purported difference mentioned by the FTC was that the Rhode Island agency had on one occasion actually held a hearing on a proposed tariff before approving it, while Massachusetts has never held any. According to the dissent, however, the significance of the Rhode Island hearing is diminished by the fact that it took place only once and by the further fact that it took place more than two and one-half years after the FTC had first issued its complaint. Another purported difference was that in Rhode Island, tariffs go into effect only after the regulatory agency issues an order *approving* a proposed tariff, whereas under Massachusetts law, tariffs filed by the NEMRB go into effect automatically after 30 days have gone by, unless they are disapproved. In the view of the dissent, this difference, likewise, has no substantive importance. Further, according to the dissent, the stipulated facts show that most of the other differences in the rate review systems of the two states pointed to by the FTC majority as justifications for the different outcomes for the two states were not actual differences. For example, the stipulations show that the rate analysts in both states believe that rates allowed to become effective without challenge in fact meet the applicable statutory standards of "just and reasonable" and that this fact implies a review on the merits in both states. The dissent concludes,

> Given the stipulated record here, the only reasonable conclusion is that the degree of active supervision in Massachusetts and Rhode Island is virtually the same and that the decision concerning NEMRB's liability should be the same in both states. In both states, the record shows that the state agency reviews NEMRB's collective ratemaking on the merits, that is, to ascertain consistency with state policy. This review, in turn, shows that the agencies in both states engage in active supervision and, therefore, the complaint allegations of violations in Massachusetts ... should be dismissed.

112 F.T.C. at ___, slip op. at 12 (dissent).

## THE ACTIVE SUPERVISION REQUIREMENT

■ We begin by looking briefly at the "state action" doctrine under which

NEMRB seeks immunity in Massachusetts from federal antitrust regulation. The doctrine first appeared in *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). The Supreme Court held in *Parker* that the Sherman Act was not intended to prohibit the sovereign states from "acts of government" that imposed restraints on competition within their borders. A state's own "action or official action directed by a state" was declared immune from the federal antitrust laws. However, the Court made it plain that a state could not simply authorize private actors to violate the Sherman Act. *Parker,* 317 U.S. at 351, 63 S.Ct. at 313–14.

A major issue since *Parker* has been drawing the line between state programs that fail legally to immunize private participants—being viewed by the Court as simply forbidden attempts by a state to authorize antitrust violations—and state schemes like that in *Parker* which involve enough overall state control so as to immunize private-actor participants.

In *California Retail Liquor Dealers Association v. Midcal Aluminum, Inc.,* 445 U.S. 97, 105–06, 100 S.Ct. 937, 943–44, 63 L.Ed.2d 233 (1980), the Court laid down the general test which all parties agree is the guiding standard here. Under *Midcal,* state action immunity exists if (1) the private parties' conduct was undertaken pursuant to "clearly articulated and affirmatively expressed" state policies to displace competition, and (2) the anticompetitive activity was "actively supervised" by the respective states. The Supreme Court later applied this test to a collective ratemaking arrangement much like the present, in *Southern Motor Carriers Rate Conference, Inc., et al. v. United States,* 471 U.S. 48, 105 S.Ct. 1721, 85 L.Ed.2d 36 (1985),[6] and we likewise applied it in *Mass. Furniture Piano Movers Association v. FTC,* 773 F.2d 391, *supra.* In *Midcal,* the Su-

preme Court struck down under the active supervision prong a retail price maintenance system for wine enacted into law by California. Under the scheme considered in *Midcal,* California required wholesalers to adhere to prices set by another wholesaler even though the state itself neither controlled nor reviewed the reasonableness of such prices. 445 U.S. at 100, 100 S.Ct. at 940–41. The Court concluded that California had simply authorized members of the industry to set prices and had then enforced the prices these private individuals had established. "The State neither (1) establishes prices nor (2) reviews the reasonableness of the price schedules; .... The State does not (3) monitor market conditions nor (4) engage in any 'pointed reexamination'[7] of the program." *Id.* at 105–06, 100 S.Ct. at 943–44 (numbers added). "The national policy in favor of competition cannot be thwarted by casting such a gauzy cloak of state involvement over what is essentially a private price-fixing arrangement." *Id.* at 106, 100 S.Ct. at 944.

The Court subsequently struck down another liquor pricing program under the active supervision prong of the *Midcal* test. *324 Liquor Corp. v. Duffy,* 479 U.S. 335, 107 S.Ct. 720, 93 L.Ed.2d 667 (1987). There as in *Midcal,* prices were set by private operators, without state review.

Most recently, in *Patrick v. Burget,* 486 U.S. 94, 108 S.Ct. 1658, 100 L.Ed.2d 83 (1988), the Supreme Court upheld the imposition of federal antitrust liability upon physicians who had terminated the hospital privileges of another physician after a purported peer review proceeding. The Court rejected the physicians' claim to state action immunity. While acknowledging that Oregon, by statute, required all hospitals to establish peer review procedures, the Court found there was no state agency that "reviews—or even could review—private [phy-

**6.** While the Court upheld the collective rate making arrangements in *Southern Motor Carriers,* it did not address the "active supervision" component of the *Midcal* formula, as active supervision was conceded.

**7.** "Pointed re-examination of the program" is apparently derived from a statement in an opin-

ion of the California Supreme Court in which that court referred to "'pointed re-examination' by the state to insure that the policies of the Sherman Act are not 'unnecessarily subordinated' to state policy." *Rice v. Alcoholic Beverage Control Appeals Board,* 21 Cal.3d 431, 445, 146 Cal.Rptr. 585, 595, 579 P.2d 476, 486 (1978).

sicians'] decisions regarding hospital privileges." 486 U.S. at 101, 108 S.Ct. at 1663. The Court stated that "[t]he active supervision prong of the *Midcal* test requires that state officials *have and exercise* power to review particular anticompetitive acts of private parties and disapprove those that fail to accord with state policy." *Id.* at 101, 108 S.Ct. at 1663 (emphasis added). "Absent such a program of supervision, there is no realistic assurance that a private party's anticompetitive conduct promotes state policy, rather than merely the party's individual interests." *Id.*

Following *Patrick's* restatement of the active supervision prong in *Midcal*, we must ask here (1) whether the MDPU *"has power to review particular anticompetitive acts of private parties and disapprove those that fail to accord with state policy, and (2) whether it sufficiently *exercises* that power. We shall discuss each of these questions in turn.

1. *Whether Massachusetts Has Power to Review and Disapprove Anticompetitive Acts That Fail to Accord with State Policy*

In sharp contrast to the relevant state law in *Patrick*, *Duffy* and *Midcal*, there is no doubt here that Massachusetts officials possess plenary power under state law to review and disapprove the filed rates set by carriers, and their agents like NEMRB, should they fail to accord with state policy. *Patrick*, 486 U.S. at 101, 108 S.Ct. at 1663. This is plainly not a situation, as was true in all three of those cases, where private

individuals from an industry or profession are authorized to engage in anticompetitive actions, with little or no power vested in state authorities to oversee and regulate them.

Massachusetts has enacted into law a comprehensive regulatory scheme over common carriers by motor vehicle. Mass. Gen.L. ch. 159B, §§ 1–22 (1986 and Supp. 1988), not only gives the MDPU absolute authority to "allow or disallow any filed or existing rates" "upon complaint of any common carrier by motor vehicle or of any other person" and to "alter or prescribe the rates of common carriers . . . in accordance with the legal standards provided in this chapter," *id.* at § 6, ¶ 5, but the state also has full licensing authority over both common and contract carriers, including the authority to assign routes, *id.* at §§ 3–4 and § 11, power to establish rules and regulations for the protection of shippers by motor vehicle, *id.* at § 5(c), authority to inspect cargo and papers relating to cargo, *id.* at § 14A, authority to examine accounts, reports, books and records of both carriers and brokers upon demand, *id.* at § 5(d), § 16A, and § 17, authority to enforce maximum hour limits for drivers, *id.* at § 18, and authority to enforce ..tatutory requirements in regard to billing and credit arrangements, *id.* at § 19A. The statute sets out clearly the state policy to be achieved by the regulatory program,[8] *id.* at § 1, and it delineates in detail the considerations to be taken into account in the process of rate review[9], the activity of great-

---

**8.** It is hereby declared to be the policy of the commonwealth to regulate transportation of property by motor carriers upon its ways in such manner as to recognize and preserve the inherent advantages of such transportation, and to foster sound economic conditions in such transportation and among carriers engaged therein in the public interest; and in connection therewith to: (1) Promote adequate, economical and efficient service by motor carriers, and reasonable charges therefor, without unjust discriminations undue preferences or advantages or unfair or destructive competitive practices, (2) improve the relations between, and coordinate transportation by and regulation of, motor carriers and other carriers, (3) develop and preserve a highway transportation system properly adapted to the needs of the commerce of the

commonwealth, and (4) promote safety upon its ways in the interests of its citizens. Mass.Gen.L. ch. 159B, § 1 (1986).

**9.** In the exercise of the power to prescribe just and reasonable rates for the transportation of property by common carriers by motor vehicle and to disallow rates filed by any such carrier, the department *shall give due consideration,* among other factors, to the inherent advantages of transportation by such carrier, to the effect of any rates under consideration upon the movement of traffic by such carriers, to the need in the public interest of adequate and efficient transportation service by such carriers, to the cost of service and to the need of revenues sufficient to enable such carriers under honest, economical and efficient management to provide such service.

est importance for purposes of the present inquiry, *id.* at § 6, ¶ 6.

The Massachusetts statute, thus, provides for comprehensive regulation of the operations of common carriers by motor vehicle—from rates charged to the licensing of routes—and, in the specific area of rate-setting, sets out clearly the considerations that must be taken into account when prescribing or disallowing rates, *see* note 8. Rates are to be reviewed, in a hearing, upon the complaint of any common carrier by motor vehicle or of any other person or upon the MDPU's own motion; and they may be allowed or disallowed in accordance with the legal standards provided in the statute.

The comprehensive scheme outlined in the statute, therefore, clearly gives to the MDPU the authority to "review particular anticompetitive acts of private parties and disapprove those that fail to accord with state policy." Massachusetts, accordingly, meets one of *Patrick*'s two requirements for "active supervision." We turn next to *Patrick*'s other requirement—a sufficient showing that the state *exercises* the power it has.

### 2. *Whether Massachusetts Exercises its Power*

In stating that states must "exercise" as well as "have" power to review and disapprove anticompetitive acts of private parties, the *Patrick* Court nowhere indicated the extent to which actual exercise must be shown. *Patrick, Midcal* and *Duffy* provide little guidance as to "exercise" since none of them had to reach that question. In all three cases, the legislatures had failed to give state authorities the power, to begin with, to meet the "active supervision" standard. Here, however, there is no lack of power: the question is only whether Massachusetts authorities are deficient in the exercise of that power. Thus, in seeking to determine what showing of actual exercise of power is needed, both the FTC and ourselves are proceeding in uncharted waters.

In the following pages, we shall analyze the evidence of the MDPU's actual operations as well as the state mandate which it is supposed to fulfill. We conclude that, for purposes of the state action doctrine, the showing Massachusetts has made of the exercise of its regulatory power is adequate.

We believe the FTC's contrary analysis is defective in two respects. First, as Commissioner Azcuenaga points out in impressive detail in her dissent, it seems quite arbitrary: the difference between Massachusetts' showing as to regulatory action, and Rhode Island's, is trivial. Yet, the FTC would immunize NEMRB's rate-making activities in Rhode Island but not immunize essentially the same activities in Massachusetts. Second, bearing in mind that the state action doctrine involves principles of federalism and comity, we think the FTC is too demanding in the showing it would require as to the rigor and efficiency of a particular state's regulatory program. Where as here the state's program is in place, is staffed and funded, grants to state officials ample power and the duty to regulate pursuant to declared standards of state policy, is enforceable in the state's courts, and demonstrates some basic level of activity directed towards seeing that the private actors carry out the state's policy and not simply their own policy, more need not be established. Otherwise, the state action doctrine would be turned on its head. Instead of being a doctrine of preemption, allowing room for the state's own action, it would become a means for federal oversight of state officials and their programs.

Before proceeding, we make two further points.

■ We do not agree with the FTC that the question of state action is one on which this court should defer to that agency, either because of its expertise or its statutory fact-finding authority. *See* 15 U.S.C. § 45(c) ("The findings of the Commission as to the facts, if supported by the evidence, shall be conclusive.") The FTC is not here interpreting the statute it has been charged with administering (i.e., the

Mass.Gen.L. ch. 159B, § 6, ¶ 6 (1986) (emphasis    added).

Federal Trade Commission Act, 38 Stat. 717 (1914), as amended, 15 U.S.C. §§ 41–45 (1990)) but instead is resolving a judicially-created principle of immunity that, if applicable, bars the FTC's jurisdiction. *Cf. Chevron U.S.A. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984). The underlying facts, consisting of state statutes and the stipulations accepted by the ALJ, are not in dispute. How these facts meld into the state action concept—the issue now before us—is a legal issue which the courts have plenary authority to decide. To be sure, the FTC's experience may arguably give it some insight into the effectiveness of a state's regulatory apparatus. However, state action immunity is a threshold issue that must be decided before the FTC's own jurisdiction attaches. Rather than an outgrowth of the statute the FTC administers, the state action doctrine was developed by the Supreme Court to give expression to considerations of federalism and comity; the FTC's authoritative role commences only after it has been decided that the challenged activities are *not* immune. Thus, in determining the sufficiency of Massachusetts' regulatory program for purposes of the state action doctrine, the FTC is not in the same position it would occupy had it already been determined that the doctrine did not shield the activities in question from the federal antitrust laws enforced by the FTC. We see the "active supervision" issue, therefore, as one for de novo judicial determination.

Second, the very existence of a comprehensive regulatory scheme like the one we have already seen is in place in Massachusetts is some evidence that regulatory control is actually exercised. *Cf. Capital Telephone Co. v. New York Telephone Co.*, 750 F.2d 1154 (2d Cir.1984) (a pre-*Patrick*

opinion holding that it would be inconsistent with the broad regulatory scheme in issue to find that the particular activities in question were subject to antitrust liability where the legislature so clearly intended to allow the Public Service Corporation to control all activities which were a reasonable part of the regulatory scheme). A far-ranging state regulatory scheme like the Massachusetts statute implies the exercise (as well as the mere existence) of power because it imposes legally enforceable duties on state officials—duties which a federal court may not, under normal principles of federalism, assume they will disregard.[10] The Massachusetts statute, as noted, requires officials to maintain just and reasonable rates, to act on complaints, to correct discriminatory rates, to consider various specified factors, and so on. It is a statute which gives to Massachusetts officials, under designated standards, a duty as well as mere authority with respect to the ultimate choice and setting of the rates. Thus, in respect to *Patrick's* requirement that the state *exercise* (as well as *have*) power, the comprehensive Massachusetts statute provides, by itself, some indicia that power is being exercised.

We do not, however, rest on inferences from the statute alone, but turn to the stipulations in the record to determine current levels of regulatory activity in Massachusetts.

An initial approach is to ask to what degree the four types of regulatory oversight whose total absence was decried in *Midcal* and *Duffy* are being exercised by Massachusetts—and to compare Massachusetts' actions in this respect with Rhode Island's, which the FTC approved. The facts in the instant case are not in dispute,

---

**10.** Such duties are enforceable by mandamus and other legal remedies in state courts. They are not mere precatory maxims. *See Lutheran Serv. Ass'n of New England, Inc. v. Metropolitan Dist. Comm'n*, 397 Mass. 341, 344, 491 N.E.2d 255, 257 (Mass.1986) ("In the absence of an alternative remedy, relief in the nature of mandamus is appropriate to compel a public official to perform an act which the official has a legal duty to perform."); *Restivo v. Town of Swansea*, 398 Mass. 1002, 1003, 495 N.E.2d 838, 839

(Mass.1986) (quoting *Bancroft v. Building Comm'r of Boston*, 257 Mass. 82, 84, 153 N.E. 319, 320 (Mass.1926) ("when the question is one of public right and the purpose is to procure the performance of a public duty, and no other remedy is open, a petitioner need not show that he has any special interest in the result [in order to seek relief in the nature of mandamus]: it is sufficient that as a citizen he is interested in the due execution of the laws")).

and the stipulations by the parties establish that the first two of the four factors absent in *Midcal* and *Duffy* are clearly present in Massachusetts: (1) Massachusetts has the last word in setting the rates, which must be filed with its officials and take effect only if not suspended or rejected by them;[11] and (2) Massachusetts reviews the reasonableness of the rates.[12] The stipulations do not indicate, however, that Massachusetts (3) monitors market conditions [13], or (4) has engaged in any "pointed reexamination" of the program. Nonetheless, as later discussed, we do not find the absence of these two latter factors to be fatal.

If we turn to Rhode Island, which has a regulatory scheme that the FTC found sufficient for "state action" immunity, we note that the last two factors are also absent. If there is a difference between Massachusetts and Rhode Island as to the four factors, it would be in regard to factor two, where—instead of a stipulation that the rate analyst would reject any rates he felt to be out of line with past average rates or extraordinarily high—it was affirmatively stipulated that in Rhode Island:

> The rate analyst also examines tariffs to ascertain whether the rates are within a "zone of reasonableness." The "zone of reasonableness," which is a measure developed by the rate analyst, consists of a range between the maximum and minimum industry averages of previously approved rates for each category of motor carrier. Those rates that fall within the "zone of reasonableness" are approved without a hearing. In determining the reasonableness of a proposed tariff, the rate analyst may also consider the percentage of the rate increase as well as the date of the carrier's last request for a price increase.

Stipulations 103–06 of August 28, 1986.

As indicated above, rates filed by NEMRB in Massachusetts go into effect automatically after a 30-day waiting period unless rejected or suspended by the MDPU, whereas in Rhode Island, rates do

---

**11.** Stipulation 55 of August 28, 1986 reads: "The MDPU is authorized to reject or suspend proposed rates which are not consistent with the statute or the MDPU's orders, rules and regulations." *See also* Mass.Gen.L. ch. 159B, § 6, ¶¶ 1, 2 (1986) ("The department may reject any tariff filed with it which is not consistent with this section and with its orders, rules and regulations under this chapter.")

Stipulation 61 reads: "The MDPU, upon complaint of any motor common carrier of property or any other person, or upon its own motion, after hearing, may allow or disallow any filed or existing rates and may alter or prescribe rates in accordance with the legal standards provided." *See* Mass.Gen.L. ch. 159B, § 6, ¶ 5 (1986).

**12.** Stipulation 51 of August 28, 1986 provides: A carrier has the right to seek whatever rate it desires. No one at the MDPU looks behind the filed rates to determine whether they accurately reflect a carrier's profits and costs. The rate analyst has never requested financial information to support a tariff nor has he rejected a rate because of the price to be charged. *However, if confronted with a tariff containing rates that in his judgment are out of line with the average rates that have been established in the involved pricing zone, or seem extraordinarily high, such as a 20% to 50% increase, he would recommend suspension and investigation of the tariff by the MDPU Commissioners.* (emphasis added)

Stipulation 62 of August 28, 1986 provides:

It is the opinion of the rate analyst that whenever tariffs become effective without rejection, suspension or hearing, that action results from *a determination that the proposed rates meet the regulatory criteria of the statute, orders, rules and regulations pertaining to motor carriers of property.* (emphasis added)

There is a rate analyst and one clerk who is responsible for processing filed motor carrier rates. Stipulations 44 and 45, August 28, 1986. There are 12 field inspectors who have police power to enforce the Massachusetts motor carrier statute; among other duties they spot check for rate violations. Stipulation 72.

Stipulation 75 of August 28, 1986 provides: [I]f a complaint alleges a violation of Chapter 159B [the motor carrier laws, including those pertaining to rates] or any order, rule or regulation adopted thereunder, it will be investigated and appropriate action taken if warranted.

Private complaints may be filed with the MDPU and are required by law to be investigated by the agency. Violations of the Massachusetts motor carrier statute are punishable by fine and may be enjoined in the Massachusetts courts at the instance of private parties as well as of the MDPU. Stipulation 76.

**13.** Stipulation 78 of August 28, 1986 provides:

Aside from its role in reviewing proposed rates, MDPU does not monitor economic conditions in the intrastate trucking industry of Massachusetts.

not go into effect until an affirmative written order has been issued by the state. Whereas Massachusetts has held no public hearings during the past six years either to investigate or to suspend a motor carrier's rate, Rhode Island has had one such hearing (after the start of the FTC's investigation), at the conclusion of which it approved the proposed rates.

In the FTC's view, the contrast in these last two factors qualifies Rhode Island under the "active supervision" prong, but is fatal to Massachusetts's ability to qualify. The FTC likewise referred prominently to Massachusetts' failure, but overlooked Rhode Island's failure, to show that it engages "in a 'pointed reexamination' of rates resulting from NEMRB's ratemaking activities." 112 F.T.C. at ____, slip op. at 17.

The FTC held that:

[t]he *Midcal* and *Patrick* decisions indicate that a state official or agency must engage in a substantive review of the challenged conduct before active supervision can be found. Such a review ensures that the state agency *has consciously considered the anticompetitive consequences of the activity* for which private parties seek approval. No clear inference of conscious state approval of the product of private collective ratemaking can be drawn from a state agency's passive acceptance or non-substantive review of rate filings. Thus, we hold that the active supervision requirement is satisfied only where the state agency has reviewed the proposed tariffs or rates on the merits.

112 F.T.C. at ____, slip op. at 14–15 (emphasis added).

We agree with the FTC that *Midcal*, 445 U.S. at 105–06, 100 S.Ct. at 943–44, and *Patrick*, 486 U.S. at 101, 108 S.Ct. at 1663, require a state to engage in substantive oversight of the challenged conduct before active supervision can be found. 112 F.T.C. at ____, slip op. at 14–15. The purpose of such review, however, is to ascertain *its consistency with state policy, Patrick*, 486 U.S. at 101, 108 S.Ct. at 1663, and not necessarily to determine the activity's anticompetitive consequences. We also disagree with the conclusion of the FTC that a state need always undertake a "pointed reexamination" in which it "consciously consider[s] the anticompetitive consequences of the activity for which private parties seek approval." 112 F.T.C. at ____, slip op. at 17, 15. There is nothing in the state action doctrine, as formulated, that turns on the economic philosophy of a state's regulatory program, the mind-set of its administrators, or the degree its goals mesh with the FTC's view of good regulatory policy. Rather, state action immunity is based on the Supreme Court's determination that Congress, in enacting the federal antitrust laws, meant *not* to preempt state programs and policies that are the genuine products of state governmental action. It is immaterial whether the policies guiding the state's actions are or are not consistent with federal antitrust aims.

The Court in *Midcal* and *Duffy* did not, moreover, indicate that the four above-mentioned elements—the complete absence of which it criticized in those cases—*all* needed to coexist for active supervision to be found. It would appear that the presence of any one or two of those elements would have sufficed, depending on the facts and circumstances. Other factors not mentioned might also have tipped the scales. We think the FTC has gone well beyond anything said by the Court in suggesting that active supervision is absent unless a state agency actively monitors market conditions or pointedly reexamines anticompetitive consequences. The FTC implicitly recognized this when it found that Rhode Island engages in active supervision of the NEMRB collective rate filings, even though Rhode Island does not monitor market conditions [14] nor engage in any "pointed reexamination" of the anticompetitive consequences of its regulatory program.

**14.** Stipulation 120 of August 28, 1986 reads: Aside from its role in reviewing proposed rates, [the Division of Public Utilities and Carriers] does not monitor economic conditions in the intrastate trucking industry of Rhode Island.

State authorities in Massachusetts could reasonably believe that by undertaking, as stipulated, to investigate any and all complaints; by relying on their analyst's expertise and his stipulated intention to review any extreme deviations in filed rates; and by looking at information from other sources,[15] they will meet their statutory mandate to prescribe just, reasonable, and nondiscriminatory rates. Especially is this so where the federal ICC shares oversight duties as to many of these same filed rates, and the ICC's views as to the justness and reasonableness of the rates are known to, and relied upon by, the MDPU.

The FTC's position, at bottom, seems to be that the "active supervision" prong necessitates an inquiry by the FTC into whether a particular state's regulatory operation demonstrates satisfactory zeal and aggressiveness. The FTC would, in effect, try the state regulator. We think this goes too far. As already noted, Massachusetts regulators are subject to a detailed set of statutory duties aimed at causing the filed rates to meet defined criteria. These duties and requirements are enforceable administratively and in the state courts, where administrative nonfeasance can be challenged and, if need be, corrected. For example, upon complaint of any person the MDPU is legally required to hold a hearing and determine the lawful rate of charge.[16]

In our federal system, a state regulatory scheme like this carries with it the presumption that the relevant state officials are faithfully carrying out their duties under the state's law. Such a presumption could perhaps be rebutted by a showing of some major state default—as might occur, for example, if the state had ceased to fund and staff the MDPU. Nothing of this type, however, has been shown here. In fact, implicit in the evidence that hearings have not been held is the recognition that there have been no complaints that would trigger such hearings. The absence of complaints in the face of an available procedure to resolve them supports an inference that the state is actively supervising. Moreover, there is evidence of the existence of an ongoing regulatory mechanism, and of significant activity. Stipulations 51 and 62 of August 28, 1986[17], already discussed above, indicate that Massachusetts exercises its power to review and disapprove joint rate filings of common carriers by motor vehicle. It is stipulated that the rate analyst would suspend rates that were out of line with established rates or extraordinarily high or that appeared to contain discriminatory provisions. It is also stipulated that the rate analyst believes that failure to reject or suspend proposed rates results from a determination that the proposed

---

15. For example, the MDPU receives rate justification data from NEMRB which the latter provides to the ICC. It is also advised as to the ICC's actions as to such filings, and presumably would learn of actions by regulatory agencies of other states.

16. The department, upon complaint of any common carrier ... or any other person, or upon its own motion, *after hearing,* may allow or disallow any filed or existing rates.... Whenever, upon complaint or in an investigation on its own initiative, the department, *after hearing,* shall be of the opinion that any rate or charge demanded, charged or collected by any common carrier by motor vehicle ... is or will be unjust or prejudicial, it *shall* determine and prescribe the lawful rate of charge ... thereafter to be made effective. Mass.Gen.L. ch. 159B, § 6, ¶ 5 (1986) (emphasis added).
   *See also id.* ¶ 6, quoted in note 8 *supra,* for the guidelines the MDPU must follow in the exercise of its duty to overrule unjust or prejudicial rates.

17. Stipulation 51 of August 28, 1986 reads:
   [I]f confronted with a tariff containing rates that in his judgment are out of line with the average rates that have been established in the involved pricing zone, or seem extraordinarily high, such as a 20% to 50% increase, [the rate analyst] would recommend suspension and investigation of the tariff by the MDPU Commissioners. Likewise, if a tariff appeared to contain discriminatory provisions, such as being applicable only for the account of a named shipper or shippers rather than being available to the general public, the [Commercial Motor Vehicle Division] would recommend suspension and investigation.
   Stipulation 62 of August 28, 1986 reads:
   It is the opinion of the rate analyst that whenever tariffs become effective without rejection, suspension or hearing, that action results from a determination that the proposed rates meet the regulatory criteria of the statute, orders, rules and regulations pertaining to motor carriers of property.

rates meet the regulatory criteria of the statute, orders, rules and regulations. This inference is supported by Stipulations 61 and 76, which establish that hearings are required where there is a complaint. The absence of hearings in the past years, rather than indicating that the rate analyst is not doing his job, instead indicate that the rates taking effect have been acceptable to affected third-parties, who need only complain to .trigger a hearing.

In a similar vein, it is stipulated that if a complaint alleges a violation of the statute or any order or regulation adopted thereunder, "it will be investigated and appropriate action taken if warranted." It is also stipulated that many of the general rate structures, general rate increases, etc. filed in Massachusetts have previously been filed with and approved by the ICC, and that if the ICC suspends or rejects any rate, NEMRB requests the MDPU to take the same action with respect to the intrastate Massachusetts proposal. The stipulations establish that the MDPU generally relies on the fact that the ICC has already conducted an investigation and reached a con-

clusion as to the justness and reasonableness of the rates.

It follows from all of the above that NEMRB is at the far pole from the liquor dealers in *Midcal* and *Duffy*, who were allowed a free hand to set rates with no state review mechanism extant. NEMRB's proposed rates are under continuing scrutiny, with the threat of suspension and investigation if a complaint is registered or the MDPU thinks they are unreasonable or discriminatory.

■ The principles of federalism embodied in *Parker* dictate the sufficiency of a degree of scrutiny on this level.[18] It is not the province of the federal courts nor of federal regulatory agencies to sit in judgment upon the degree of *strictness* or *effectiveness* with which a state carries out its own statutes. It is sufficient that a meaningful scheme of regulation is in existence and that there are sufficient indications that active regulation under this scheme is taking place.

A state's antitrust immunity springs from an essential principle of federalism, the necessity to respect a sovereign ca-

---

**18.** We agree with commentators who state that a court (and, by analogy, the FTC in its adjudicatory capacity) should not scrutinize the rigor with which the state supervises the challenged activity to ensure that supervision is more than pro forma. P. Areeda & D. Turner, *Antitrust Law*, § 213c, at 75 (1978). Instead, for many of the same reasons that the Supreme Court refuses strictly to scrutinize state economic regulation under the Fourteenth Amendment, the antitrust adjudicatory body must accept the state's apparent supervision on its face. P. Areeda & D. Turner, *Antitrust Law*, § 213c, at 75 (1978).

> There simply is no way to tell if the state has "looked" hard enough at the data, and there certainly are no manageable judicial standards by which a court may weigh the various elements of a "public interest" judgment in order to determine whether the legislature or agency decision was correct. Those are political judgments and ought to be made by the legislature and its delegates.

*Id.*

*See also United States v. Topco Associates,* 405 U.S. 596, 611–12, 92 S.Ct. 1126, 1135–36, 31 L.Ed.2d 515 (1972) (Brennan, J., concurring) ("To analyze, interpret, and evaluate the myriad of competing interests and the endless data that would [ ] be brought to bear on [ ] decisions" to sacrifice competition in one portion of the econ-

omy for greater competition in another portion, "and to make the delicate judgment on the relative values to society of competitive areas of the economy, the judgment of the elected representatives of the people is required." "[C]ourts are ill-equipped and ill-situated for such decision-making."); *Denver Rockets v. All–Pro Management, Inc.,* 325 F.Supp. 1049, 1063 (C.D.Cal. 1971) ("The primary disadvantages of the 'rule of reason' are that it requires difficult and lengthy factual inquiries and very subjective policy decisions which are in many ways essentially legislative and ill-suited to the judicial process.").

Areeda and Turner believe that "an allegation that state officials customarily 'rubber stamp' the self-interested decisions or recommendations of the private parties involved should not ordinarily oust *Parker* immunity." P. Areeda & D. Turner, § 213c, at 75 (1978).

*See also Llewellyn v. Crothers,* 765 F.2d 769 (9th Cir.1985):

> The availability of *Parker* immunity ... does not depend on the subjective motivations of the individual actors, but rather on the satisfaction of the objective standards set forth in *Parker* and authorities which interpret it. This must be so if the state action exemption is to remain faithful to *its foundations in federalism and state sovereignty.*

*Id.* at 774 (emphasis added).

pacity in the several states. *Hoover v. Ronwin*, 466 U.S. 558, 567–68, 104 S.Ct. 1989, 1995–96 [80 L.Ed.2d 590] (1984). Given this purpose, it follows that *actions otherwise immune should not forfeit that protection merely because the state's attempted exercise of its power is imperfect in execution under its own law.*

*Llewellyn v. Crothers,* 765 F.2d 769, 774 (9th Cir.1985) (emphasis added).

In summary, the statute here clearly calls for the active supervision of the rates filed. We know, further, that a regulatory agency has been established and funded to carry out that statutory mandate, and that state officials are positioned to carry out their statutory duties. Furthermore, the stipulations in the case indicate that unreasonable rates will be rejected and that the failure to suspend or reject a rate indicates a determination that the rate has been found to meet the regulatory criteria of the statute, orders, rules, and regulations. There is an administrative mechanism in place for aggrieved parties to register their complaints and be heard. Further, the Massachusetts courts are available and are empowered to force the regulators to act at the suit of aggrieved parties. In addition, the majority of the rates in question have been previously filed with and investigated by the ICC.

We hold that a showing of this magnitude is sufficient, without more, to meet the "active supervision" prong of the *Midcal* test for qualifying to invoke the "state action" defense of *Parker.* Specifically, Massachusetts both *has* and *exercises* relevant regulatory power. *Patrick,* 486 U.S. at 101, 108 S.Ct. at 1663. The FTC commissioners erred by trying to gauge in too particular a way the degree of actual effectiveness or ineffectiveness exhibited by the Massachusetts regulators.

### CONCLUSION

Pursuant to our holding that Massachusetts regulatory scheme qualifies for the invocation of the *Parker* "state action" defense to antitrust liability by satisfying not only the first but also the second ("active

supervision") prong of the *Midcal* test, we direct the FTC to modify its final order issued August 18, 1989, by deleting the references to Massachusetts that appear at the end of the "Provided" limiting provisos in Paragraphs I and II, and by making such further modifications, if any, as may be necessary to conform the order in all respects with this opinion. As so modified, the order is enforced.

*So ordered.*