922 F.2d 1122
 59 USLW 2433, 1991-1 Trade Cases 69,293
 TICOR TITLE INSURANCE COMPANY, Chicago Title Insurance
Company, SAFECO Title Insurance Company (now known as
Security Union Title Insurance Company), Lawyers Title
Insurance Corporation and Stewart Title Guaranty Company, Petitioners,
v.
FEDERAL TRADE COMMISSION, Respondent.
 No. 89-3787.
 United States Court of Appeals,
Third Circuit.
 Argued Aug. 28, 1990.
Decided Jan. 9, 1991.
Order on Denial of Rehearing and
Rehearing In Banc March 12, 1991.
 
 John C. Christie, Jr., Patrick J. Roach, Bell, Boyd & Lloyd, Washington, D.C., for petitioners Chicago Title Ins. Co. and SAFECO Title Ins. Co. (now known as Security Union Title Ins. Co.).
 Robert E. Cooper, Gibson, Dunn & Crutcher, Los Angeles, Cal., and Phillip H. Rudolph, Gibson, Dunn & Crutcher, Washington, D.C., for petitioner Ticor Title Ins. Co.
 John F. Graybeal (argued), John J. Butler, Parker, Poe, Adams & Bernstein, Raleigh, N.C., for petitioner Lawyers Title Ins. Corp.
 David M. Foster, James N. Plamondon, Fulbright & Jaworski, Washington, D.C., for petitioner Stewart Title Guar. Co.
 James M. Spears, Gen. Counsel, Jay C. Shaffer, Deputy Gen. Counsel, Ernest J. Isenstadt, Asst. Gen. Counsel, Leslie Rice Melman (argued), F.T.C., Washington, D.C., for respondent.
 Heidi B. Hamman Shakely and Zella M. Smith, Asst. Counsels, Victoria A. Reider, Deputy Chief Counsel, Linda J. Wells, Chief Counsel, Com. of Pennsylvania, Ins. Dept., Harrisburg, Pa., for amicus curiae Com. of Pennsylvania, Ins. Dept.
 Before HUTCHINSON and NYGAARD, Circuit Judges, and RE, Judge*.
 OPINION OF THE COURT
 HUTCHINSON, Circuit Judge.
 
 
 1
 Five of the nation's largest title insurance companies, Ticor Title Insurance Company, Chicago Title Insurance Company, SAFECO Title Insurance Company (now operating under the name Security Union Title Insurance Company), Lawyers Title Insurance Corporation and Stewart Title Guaranty Company (collectively Ticor), petition for review of a final order of the Federal Trade Commission (FTC). In a forty-seven page majority opinion that formed the basis of the FTC's final order, the FTC held that the five title insurance companies engaged in "[u]nfair methods of competition" in violation of Sec. 5 of the Federal Trade Commission Act (FTC Act), 15 U.S.C.A. Sec. 45(a)(1) (West Supp.1990), when they collectively agreed to set rates for title search and examination services in six states. The final order found antitrust violations in Arizona, Connecticut, Montana, New Jersey, Pennsylvania and Wisconsin.
 
 
 2
 In its petition for review, Ticor does not dispute the FTC's holding that the horizontal price-fixing agreements among five of the nation's largest title insurance companies for title search and examination services at issue in this case were anti-competitive and unfair within the meaning of Sec. 5 of the FTC Act. Instead, Ticor advances four alternate arguments for reversal of the FTC's final order. Ticor's first argument is that the state action doctrine, which traces its origin to the Supreme Court's opinion in Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), immunizes its challenged collective rate setting activities from antitrust liability. Ticor's second argument is that its challenged activities are exempt from the antitrust laws pursuant to Sec. 3(a) of the McCarran-Ferguson Act, 15 U.S.C.A. Sec. 1013(a) (West 1976). Ticor's third argument is that its activities constitute joint petitioning of state regulators immune from antitrust liability under the Noerr-Pennington doctrine. See Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); United Mine Workers v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). Ticor's final and most abbreviated argument, taking up less than two pages of the ninety pages of briefing it submitted in this cause, is that the FTC's final order is void because its proceeding violated the doctrine of separation of powers since the FTC exercises executive power and yet is not subject to the executive branch's control.[1]
 
 
 3
 For the reasons set forth below, we hold that Ticor's collective rate setting for title search and examination services in these six states is immune from federal antitrust liability under the state action doctrine. As we examine in more detail below, the state action doctrine limits the reach of the FTC's enforcement jurisdiction. As a result, we find it unnecessary to address at any great length Ticor's other three arguments in favor of reversing the FTC's order. Thus, we will grant Ticor's petition for review and will vacate the FTC's final order.
 
 I.
 
 4
 On January 7, 1985, the FTC issued an administrative complaint alleging that six[2] of the nation's largest title insurance companies had engaged in "[u]nfair methods of competition" in violation of Sec. 5 of the FTC Act, 15 U.S.C.A. Sec. 45(a)(1) (West Supp.1990).[3]
 
 
 5
 The alleged antitrust violation was the insurers' agreements collectively to set rates for title search and examination services.[4] At one time or another, these insurers set uniform rates for title search and examination services through private "rating bureaus" in thirteen states. The FTC did not challenge the insurers' collective formulation of uniform rates for insuring against the risk of loss from defective title. Thus, this aspect of title insurance is not before us.
 
 
 6
 The matter came before an administrative law judge (ALJ) who held hearings and took evidence. The ALJ issued an initial decision and proposed order on December 26, 1986. The ALJ found without merit the insurers' claims that the collective formulation of rates for title search and examination services is part of the "business of insurance" exempt from the FTC Act pursuant to Sec. 3(a) of the McCarran-Ferguson Act, 15 U.S.C.A. Sec. 1013(a) (West 1976). The ALJ also rejected the insurers' claim that the challenged conduct was protected from antitrust liability under the Noerr-Pennington doctrine as joint petitioning of state regulators in an attempt to influence state policy.
 
 
 7
 As to the insurers' remaining defense of state action,[5] the ALJ ruled that in Connecticut and Wisconsin the insurers' collective rate setting was not supervised at all and thus could not satisfy the "active supervision" requirement of the doctrine. The ALJ held that the insurers' price-fixing in Arizona, Idaho, Montana, New Jersey and Pennsylvania satisfied the two-pronged state action defense and was thus immune from antitrust liability. Finally, the ALJ ruled that with respect to Ohio, the FTC's complaint counsel, who prosecuted the case on behalf of the government, failed to prove that the insurers used their rating bureau to establish uniform rates for title search and examination services.
 
 
 8
 The insurers appealed the ALJ's initial decision to the FTC, and complaint counsel cross-appealed. On September 19, 1989, the FTC, through four commissioners, issued its final order and decision affirming in part and reversing in part the ALJ's decision.[6] It is the FTC's decision that is before us for review.
 
 
 9
 In its decision, the FTC independently considered the record, including the ALJ's initial decision and findings. With respect to the insurers' state action defense, the FTC rejected its application to New Jersey and Pennsylvania, finding that the relevant state statutes did not clearly articulate a policy to displace competition with regulation.[7] The FTC found that the contrary position that the state insurance departments in both states advanced was in conflict with the plain and unambiguous meaning of the relevant state statutes.
 
 
 10
 The FTC also rejected the state action defense as to Arizona, Connecticut, Montana and Wisconsin on the ground that the "active supervision" requirement of the state action doctrine was not satisfied.[8] The FTC dismissed the complaint's allegations concerning Idaho and Ohio. It split evenly over whether there was active supervision of the insurers' collective ratemaking in Idaho. It agreed with the ALJ that the FTC's complaint counsel failed to demonstrate a sufficient link between the collective filing of risk rates and fees for the insurers' search and examination services in Ohio.
 
 
 11
 Next, the FTC held that the insurers' collective formulation of charges for search and examination services was not part of the "business of insurance" and thus was not exempt from regulation under the FTC Act by reason of the McCarran-Ferguson Act. The FTC agreed with the ALJ that searches and examinations are services that persons and entities other than insurance companies commonly perform. Further, the FTC found that insurance companies themselves usually differentiate between the rates charged for indemnification against loss from non-record title defects (which the FTC viewed as the core function of title insurance) and the rates charged for tracking down title defects prior to writing the policy.
 
 
 12
 The FTC then went on to reject the insurers' claim that their collective ratemaking for search and examination services was immunized from antitrust regulation under the Noerr-Pennington doctrine. The FTC wrote that the challenged conduct was the type of commercial activity that has traditionally had its validity determined by the antitrust laws and was not "political activity with a commercial impact." Joint Appendix (Jt.App.) at 170.
 
 
 13
 The FTC's final order to cease and desist prohibits the insurers from fixing prices for title search and examination services in the six states where violations of law were found. However, the order contains a proviso that permits collective establishment of rates for search and examination services in any of these states if undertaken "pursuant to clearly articulated and affirmatively expressed state policy and where such collective activity is actively supervised by a state regulatory body."[9] Jt.App. at 125.
 
 
 14
 In their petition to this Court, the insurers ask us to reverse the FTC's final order. The FTC asks us to affirm the order and to issue our own order mandating its enforcement, which Congress requires us to do to the extent the FTC's order is affirmed. See 15 U.S.C.A. Sec. 45(c) ("To the extent the order of the Commission is affirmed the court shall thereupon issue its own order commanding obedience to the terms of such order of the Commission.").
 
 II.
 
 15
 As a result of the FTC's dismissal in its final decision of the complaint's allegations concerning Ticor's settlement and escrow services, the issues before us relate solely to Ticor's collective setting of rates for title search and examination services. A brief description of title search and examination services, and the role such services play in the issuance of a policy of title insurance, is helpful to an understanding of this case.[10]
 
 
 16
 Title to a piece of real estate is evidence of an ownership interest in that property. However, title is not proof of absolute ownership. For example, a search of public records concerning a particular piece of real estate may disclose that there are liens, encumbrances, easements, covenants, restrictions or other claims in existence as to that property. Examination of the title itself would often reveal none of these preexisting defects.
 
 
 17
 As a result, potential purchasers of real estate and their lenders desire to know before purchasing or financing a purchase of property whether the title has any preexisting defects. Once such defects are discovered, the purchasers and lenders can determine whether to continue with the deal as is, whether to demand cure of certain or all of the defects or whether to call off the deal.
 
 
 18
 Title insurance did not become widely used until after the conclusion of World War II. At that time, a national market in secondary mortgages emerged. The attractiveness of title insurance was due in large part to the limitations inherent in the two methods of verifying title that existed prior to the widespread use of title insurance. These two methods that were seen as somewhat unsatisfactory were the use of title searchers and the use of attorneys' opinions.
 
 
 19
 The role of title searchers is clear from their name. They examine the public records concerning a piece of property, which includes the chain of title for that property, and report the results of that examination. A title searcher's liability for an erroneous report was limited, however, to his negligence. If the searcher made an error in searching the public records, someone harmed could recover only after proving that a reasonable title searcher would not have made such an error. Furthermore, a title searcher had no liability for title defects that were not listed in the public records. Title searchers continue to practice their trade today; however, most now work for title insurance companies.
 
 
 20
 The meaning of an attorneys' opinion is also largely self-evident. Whereas title searchers merely report on the existence of recorded documents concerning a particular title, an attorneys' opinion evaluates the legal significance of any title defects that have been discovered. However, an attorney's liability for an erroneous opinion is also limited to his professional negligence. Thus, just as with title searchers, an attorney is not liable for hidden defects in the public records that a diligent searcher could not have discovered or for public records that are themselves inaccurate.
 
 
 21
 By comparison, title insurance offers much broader protection in the event that the state of the title differs from that which a title insurance company reports it to be. The technical definition of title insurance is an agreement to indemnify the purchaser or lender "for loss or damage sustained by reason of a defect in title not explicitly excepted or excluded from the policy." Jt.App. at 37. In order to recover, it is unnecessary to prove negligence. Further, title insurance protects the buyer and the lender from losses resulting from defects not discoverable from a search of the public records. Such undiscoverable defects can include forgery, missing heirs, previous marital interests, impersonation and confusion of names.
 
 
 22
 As noted just above, title insurance indemnifies the purchaser or lender for loss or damage sustained by reason of a defect in title not explicitly excepted or excluded from the policy. Before issuing a title insurance policy, the insurance company conducts a search of the public records just as a title searcher or an attorney would do. In fact, title insurance companies most often employ their own searchers or attorneys to search and examine the public records. The title insurance policy usually will not insure any defects that are uncovered during this search. Instead, agents are trained specifically to exempt these record defects from the scope of coverage. Thus, a title insurance policy usually insures only against undiscovered and undiscoverable title defects, regardless of negligence.
 
 
 23
 Title insurance companies choose from among three different groups of people to perform title searches. In the first group are title searchers who work for the title insurance company. We have already examined the role that such title searchers play. The second is the attorney-agent, who serves as an agent of one or several particular insurance companies. The attorney-agent searches and examines title documents. As compensation for his work, the agent receives from the title insurance company a fee that the insurance company has fixed in advance. The third is the approved attorney. An approved attorney does not have a direct employment relationship with the insurance company as does the attorney-agent. Instead, the title insurance company provides a list of approved attorneys to its customers; then, the customer and the approved attorney are free to negotiate the approved attorney's fee for the search and examination services he will perform. Often the same attorney will be an attorney-agent for one title insurance company and an approved attorney for another.
 
 
 24
 While often difficult to separate, a title search is distinct from a title examination. The search denotes the act of compiling a chronological account of the publicly recorded instruments that are found in the chain of title to a particular piece of real estate. Many jurisdictions require that the search extend back sixty years, although some jurisdictions have marketable title acts that require a shorter resort to history while other jurisdictions require tracing title as far back as its original issuance by the sovereign. The examination requires the critical evaluation of the title's condition as reflected in the documents gathered in the search.
 
 
 25
 This case involves Ticor's collective setting of rates for the search and examination services it performs. In the six states at issue, these rates are collectively set through private organizations known as title insurance rating bureaus. Title insurance companies comprise the membership of these bureaus. Once the title insurance rating bureau establishes the uniform rate for search and examinations services in a certain state, the insurance companies that are members of the bureau charge this rate for these services.
 
 III.
 
 26
 We have jurisdiction pursuant to 15 U.S.C.A. Sec. 45(c) (West 1973) over the FTC's final order in this matter, since the FTC's cease and desist order includes within its scope methods of competition practiced within this Circuit. Ticor filed its petition for review within sixty days after the FTC served the final order,[11] which is within the applicable time the statute provides for filing such a petition. The FTC had jurisdiction to adjudicate this matter pursuant to 15 U.S.C.A. Sec. 45(b) (West Supp.1990).
 
 
 27
 We have written that "the state action exemption cases clearly indicate that this issue involves a question of law...." Euster v. Eagle Downs Racing Ass'n, 677 F.2d 992, 997 (3d Cir.), cert. denied, 459 U.S. 1022, 103 S.Ct. 388, 74 L.Ed.2d 519 (1982); see also New England Motor Rate Bureau, Inc. v. FTC, 908 F.2d 1064, 1072 (1st Cir.1990) ("How these facts meld into the state action concept--the issue now before us--is a legal issue which the courts have plenary authority to decide." ). Thus, we exercise plenary review over the FTC's application of the state action doctrine to the facts before us.
 
 IV.
 
 28
 As the Supreme Court has stated, "[t]he starting point in any analysis involving the state-action doctrine is the reasoning of Parker v. Brown [, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943) ]." Hoover v. Ronwin, 466 U.S. 558, 566, 104 S.Ct. 1989, 1994, 80 L.Ed.2d 590 (1984). In Parker, the Supreme Court wrote:
 
 
 29
 We find nothing in the language of the Sherman Act or in its history which suggests that its purpose was to restrain a state or its officers or agents from activities directed by its legislature. In a dual system of government in which, under the Constitution, the states are sovereign, save only as Congress may constitutionally subtract from their authority, an unexpressed purpose to nullify a state's control over its officers and agents is not lightly to be attributed to Congress.
 
 
 30
 The Sherman Act makes no mention of the state as such, and gives no hint that it was intended to restrain state action or official action directed by a state.
 
 
 31
 Parker, 317 U.S. at 350-51, 63 S.Ct. at 313. In 324 Liquor Corp. v. Duffy, 479 U.S. 335, 343, 107 S.Ct. 720, 725, 93 L.Ed.2d 667 (1987), the Supreme Court wrote that Parker "rests on principles of federalism and state sovereignty."
 
 
 32
 The "state action" doctrine immunizes private price-fixing if such conduct is (1) undertaken pursuant to a clearly articulated and affirmatively expressed state policy to displace competition with regulation and (2) the state itself actively supervises the conduct. See Southern Motor Carriers Rate Conference, Inc. v. United States, 471 U.S. 48, 57, 105 S.Ct. 1721, 1726, 85 L.Ed.2d 36 (1985); California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc., 445 U.S. 97, 105, 100 S.Ct. 937, 943, 63 L.Ed.2d 233 (1980).
 
 A.
 
 33
 As to New Jersey and Pennsylvania, the FTC determined that Ticor's fixing of title search and examination charges did not reflect a clearly articulated and affirmatively expressed state policy as is required under the first prong of the Midcal test. The FTC's complaint counsel conceded for purposes of this litigation that both New Jersey and Pennsylvania actively supervised Ticor's fixing of title search and examination services in the two states, thereby satisfying Midcal 's second prong. See Jt.App. at 69 n. 184.
 
 
 34
 Two Supreme Court cases are central to an understanding of Midcal 's first prong, which requires that a state policy must be clearly articulated and affirmatively expressed in order to confer antitrust immunity. Those cases are Town of Hallie v. City of Eau Claire, 471 U.S. 34, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985), and Southern Motor Carriers, 471 U.S. 48, 105 S.Ct. 1721, 85 L.Ed.2d 36.
 
 
 35
 In Hallie, the Supreme Court was faced with deciding whether a municipality's anticompetitive conduct met the first prong of the Midcal test.[12] In deciding whether the state clearly articulated and affirmatively expressed an anticompetitive policy, the Supreme Court adopted the views of the plurality in City of Lafayette v. Louisiana Power & Light Co., 435 U.S. 389, 415, 98 S.Ct. 1123, 1138, 55 L.Ed.2d 364 (1978) (opinion of Brennan, J.), that one need not "be able to point to a specific, detailed legislative authorization" in order to satisfy Midcal 's first prong. See Hallie, 471 U.S. at 39, 105 S.Ct. at 1716. Instead, the Court in Hallie held it was sufficient to satisfy the "clear articulation" test that Wisconsin's legislature had passed statutes giving the municipality "broad authority to regulate," thus making it "clear that anticompetitive effects logically would result." Id. at 42, 105 S.Ct. at 1718; see also New Motor Vehicle Bd. v. Orrin W. Fox Co., 439 U.S. 96, 109, 99 S.Ct. 403, 411, 58 L.Ed.2d 361 (1978) (while California's Automobile Franchise Act evidenced no express intent to displace the antitrust laws, it nevertheless qualified for state action immunity because Act provided a regulatory structure that inherently "displace[d] unfettered business freedom.").
 
 
 36
 Thus, in Hallie the Supreme Court held that in order to satisfy the clear articulation requirement of the state action test, one merely had to show that "the legislature contemplated the kind of action complained of." Hallie, 471 U.S. at 44, 105 S.Ct. at 1719 (quotation omitted). In so doing, the Court rejected a competing argument that to satisfy the clear articulation requirement the legislature had to "expressly state in a statute or its legislative history that the legislature intends for the delegated action to have anticompetitive effects." Id. at 43, 105 S.Ct. at 1718. In a footnote, the Court explained why it rejected this argument:
 
 
 37
 Requiring such a close examination of a state legislature's intent to determine whether the federal antitrust laws apply would be undesirable ... because it would embroil the federal courts in the unnecessary interpretation of state statutes. Besides burdening the courts, it would undercut the fundamental policy of Parker and the state action doctrine of immunizing state action from federal antitrust scrutiny.
 
 
 38
 Id. at 44 n. 7, 105 S.Ct. at 1719 n. 7.
 
 
 39
 In Southern Motor Carriers, the Supreme Court held that a state did not have to compel private parties to perform anticompetitive conduct in order for the state action doctrine to immunize such conduct from antitrust liability. See Southern Motor Carriers, 471 U.S. at 60, 105 S.Ct. at 1728. Instead, a clearly articulated policy that permits anticompetitive conduct is sufficient to meet the state action doctrine's clear articulation requirement. See id. at 61, 105 S.Ct. at 1729. Thus, the issue in Southern Motor Carriers was whether the state legislatures in Georgia, Mississippi, North Carolina and Tennessee clearly sanctioned the collective ratemaking at issue there.
 
 
 40
 The Court found that three of the states, Georgia, North Carolina and Tennessee, had statutes that expressly permitted common carriers to engage in collective ratemaking. See id. at 63, 105 S.Ct. at 1730. However, Mississippi posed a more difficult question, since its legislature "ha[d] not specifically addressed collective ratemaking." Id. Thus, the Court had to decide "whether, in the absence of a statute expressly permitting the challenged conduct, the first prong of the Midcal test can be satisfied." Id.
 
 
 41
 In Mississippi, the only evidence of whether the legislature had contemplated the action complained of was a law that gave the state public service commission the authority to regulate common carriers. See id. The law required the commission to promulgate "just and reasonable" rates. See id. The Court held that this law was sufficient evidence of the legislature's intent that the commission, instead of the competitive market, should determine the rates. Even though the legislature did not supply the details of "the inherently anticompetitive rate-setting process," id. at 64, 105 S.Ct. at 1730, it was sufficient that the legislature left such details up to the commission's discretion. Thus, when the commission "exercised its discretion by actively encouraging collective ratemaking among common carriers," the Supreme Court held that the carriers who took advantage of the ability to set rates collectively in Mississippi were immune from antitrust liability under the state action doctrine. Id. The Court concluded:
 
 
 42
 If more detail than a clear intent to displace competition were required of the legislature, States would find it difficult to implement through regulatory agencies their anticompetitive policies. Agencies are created because they are able to deal with problems unforeseeable to, or outside the competence of, the legislature. Requiring express authorization for every action that an agency might find necessary to effectuate state policy would diminish, if not destroy, its usefulness. Therefore, we hold that if the State's intent to establish an anticompetitive regulatory program is clear, as it is in Mississippi, the State's failure to describe the implementation of its policy in detail will not subject the program to the restraints of the federal antitrust laws.
 
 
 43
 Id. at 64-65, 105 S.Ct. at 1730-1731 (citation and footnote omitted).
 
 1.
 
 44
 With these teachings in mind, we will first examine whether the State of New Jersey has a clearly articulated and affirmatively expressed policy that permits Ticor to charge collectively set rates for title search and examination services that its attorney-agents perform. The FTC held, over the dissent of Commissioner Calvani, that New Jersey lacked such a policy and therefore ruled that Ticor's activities in that state were not immune under the state action doctrine. The FTC's holding reversed the ALJ's holding that New Jersey did authorize the collective setting of rates for fees paid to attorney-agents for the title search and examination services they perform. See Jt. App. at 111.
 
 
 45
 New Jersey law pertaining to title insurance companies is found at N.J.Stat.Ann. Secs. 17:46B-1 to -62 (West 1985 & Supp.1990). It is known as the Title Insurance Act of 1974. See N.J.Stat.Ann. Sec. 17:46B-2. It is clear that New Jersey's legislature intended the Act to have broad application. Section 17:46B-3 states:
 
 
 46
 The provisions of this act shall apply to all title insurance companies, title insurance rating organizations, title insurance agents, applicants for title insurance, policyholders and to all persons and business entities engaged in the business of title insurance.
 
 
 47
 Id. Sec. 17:46B-3.
 
 
 48
 The FTC based its holding that New Jersey did not have a clearly articulated policy that permitted the collective setting of fees to be paid to attorney-agents for the search and examination services they perform upon the Act's definition of "fee." See id. Sec. 17:46B-1(f). While the Act permits title insurance companies to engage in the collective setting of rates, which include fees, through their privately operated rating bureaus, see id. Secs. 17-46B-41 to -53, the FTC held that New Jersey's definition of "fee" explicitly excluded any reimbursement paid to an attorney.
 
 The Act's definition of "fee" states:
 
 49
 "Fee" for title insurance means and includes the premium for the assumption of the insurance risk, charges for abstracting or searching, examination, determining insurability, and every other charge, whether denominated premium or otherwise, made by any of them, but the term "fee" shall not include any charges paid to and retained by an attorney at law whether or not he is acting as an agent of a title insurance company or an approved attorney.
 
 
 50
 Id. Sec. 17:46B-1(f).[13] Ticor argues that Sec. 17:46B-1(f)'s definition of fee is intended merely to make clear that the state will not regulate legal fees unrelated to title insurance transactions, such as issuing opinions.
 
 
 51
 In support of its argument, Ticor points to the fact that New Jersey's Commissioner of Insurance, the state official whom the legislature has charged with regulating the title insurance industry, has approved its collective filings of rates that included the charges paid to attorney-agents for title search and examination services. See Jt.App. at 626-59. The Act requires the Commissioner to disapprove any filing that "does not meet the requirements of this act." N.J.Stat.Ann. Sec. 17:46B-45(b).[14] Further, Ticor points to the ALJ's finding that "the history of title insurance rate regulation in New Jersey suggests that the state intended that inclusive rates should apply to attorney-agents." Jt.App. at 68.
 
 
 52
 The state action doctrine rests on principles of federalism and state sovereignty. Since the Supreme Court of New Jersey has not yet spoken on whether the Act permits New Jersey to regulate attorney-agent charges for search and examination services, we are forced to predict how that court would resolve the question. The Act, taken as a whole, clearly indicates New Jersey's intent to regulate broadly the state's title insurance industry. In the face of that strong intent, we believe the Supreme Court of New Jersey would hold that Ticor's suggested construction of the Act's definition of "fee" is reasonable. Under Ticor's construction, "fee" is defined to exclude charges paid to attorneys solely as a concession to the state's organized bar, in order to make clear that the Insurance Commissioner is not empowered to regulate generally the fees attorneys charge.
 
 
 53
 Under New Jersey law, where a state agency is empowered to implement a regulatory scheme pursuant to an ambiguous statutory framework, state courts will defer to the agency's reasonable construction of the statute. See In re Township of Bridgewater, 95 N.J. 235, 471 A.2d 1, 5-6 (1984) ("We have held that an administrative agency's interpretation of a statute that it is charged with enforcing is entitled to due deference."). We believe the Insurance Commissioner's construction of the Act to permit his regulation of attorney-agents' charges for search and examination services is reasonable and thus worthy of our deference.
 
 
 54
 Furthermore, we believe it is possible to construe the Act to permit the Commissioner to regulate what attorney-agents charge for title search and examination services, even if such charges do in fact fall outside the Act's definition of "fee." In Schwartz v. Commonwealth Land Title Ins. Co., 374 F.Supp. 564 (E.D.Pa.1974), Judge Becker, then a United States District Judge and now a member of our Court, was faced with a similar quandary. There, the court had before it the question of whether the Pennsylvania state Insurance Department in fact regulated a charge that sellers of real estate had to pay at the closing of a sale when the closing occurred in the office of a title insurance company. While the Insurance Department refused to accept filing of the so-called "seller charge" as a fee, Judge Becker wrote that "[t]he Department's view that the charge was not a 'fee' did not preclude its regulation under a number of other provisions, and the Department never suggested that it had no power to regulate the seller charge simply because it was not a 'fee.' " Id. at 577 n. 16. Thus, the court held: "We find that the Pennsylvania regulatory statutes are comprehensive and confer virtually plenary regulatory power on the state Insurance Department, including the power to regulate the seller charge." Id. at 577.
 
 
 55
 Likewise, we hold that the FTC erred when it held that New Jersey lacked a clearly articulated policy to permit the collective setting of rates attorney-agents will be paid for the search and examination services they provide. Even if we were to agree that such charges are excluded from the statutory definition of the word "fee," this does not preclude New Jersey from otherwise regulating this discrete charge.
 
 
 56
 Finally, we will once again assume that New Jersey's Insurance Commissioner lacks the statutory authority to regulate search and examination charges paid to attorney-agents. As Professors Areeda and Hovenkamp, distinguished students of antitrust law, have written: "If the private defendant's challenged conduct is the result of reasonable reliance on apparently lawful government action, then [state action] immunity [under Midcal 's clear articulation prong] should be available." P. Areeda & H. Hovenkamp, Antitrust Law Sec. 212.4b, at 153 (Supp.1989).
 
 
 57
 Even if New Jersey's Supreme Court should declare in the future that New Jersey's Insurance Commissioner's regulation of Ticor's collective setting of rates paid to attorney-agents for search and examination services was unlawful, we believe that the professors are correct that Ticor's actions in reliance on the apparent lawfulness of the Commissioner's actions would provide antitrust immunity up until such a declaration occurs. As the professors have written: "The agency's action must have reasonably appeared to be lawful both in relation to the antitrust laws--for example, no wholesale delegation of unsupervised private power to act anticompetitively--and in relation to the scope of the agency's authority under state law." Id. at 154. We believe that Ticor meets both of these requirements in New Jersey. See also Llewellyn v. Crothers, 765 F.2d 769, 774 (9th Cir.1985) (Kennedy, J.) (" 'ordinary' errors or abuses in the administration of powers conferred by the state should be left for state tribunals to control" (quoting Areeda, Antitrust Immunity for "State Action" after Lafayette, 95 Harv.L.Rev. 435, 453 (1981))).
 
 2.
 
 58
 The relevant facts in Pennsylvania are basically the same. The FTC held, over the dissent of Commissioner Calvani, that Pennsylvania lacked a policy that permitted the collective setting of rates that attorney-agents charge for search and examination services. The FTC therefore ruled that Ticor's activities in that state were not immune under the state action doctrine. The FTC's holding reversed the ALJ's holding that Pennsylvania did authorize the collective setting of rates for fees paid to attorney-agents for the title search and examination services they perform. See Jt.App. at 111.
 
 
 59
 Pennsylvania's Title Insurance Act, found at 40 Pa.Stat.Ann. Secs. 910-1 to 910-54 (Purdon 1971 & Supp.1990), also has broad application. It states:
 
 
 60
 The provisions of this article shall apply to all title insurance companies, title rating organizations, title insurance agents, applicants for title insurance, policyholders and to all persons and business entities engaged in the business of title insurance.
 
 
 61
 40 Pa.Stat.Ann. Sec. 910-2. The Pennsylvania Insurance Department is the state's executive agency entrusted with the responsibility of executing and enforcing all of Pennsylvania's insurance laws. See Brief of Pennsylvania Insurance Department as amicus curiae at 4. The Act requires insurance companies or the private rating organizations to which they belong to file with the Insurance Department a manual of fees. See 40 Pa.Stat.Ann. Sec. 910-37(a).
 
 
 62
 Once again, in holding that Pennsylvania had not clearly articulated a policy that permits the collective setting of rates paid to attorney-agents for search and examination services, the FTC relied on the Act's definition of "fee." The definition states:
 
 
 63
 "Fee" for title insurance means and includes the premium, the examination and settlement or closing fees, and every other charge, whether denominated premium or otherwise, made by a title insurance company, agent of a title insurance company or an approved attorney of a title insurance company, or any of them, to an insured or to an applicant for insurance, for any policy or contract for the issuance of, or an application for any class or kind of, title insurance; but the term "fee" shall not include any charges paid by an insured or by an applicant for insurance, for any policy or contract, to an attorney at law acting as an independent contractor and retained by such attorney at law, whether or not he is acting as an agent of or an approved attorney of a title insurance company, or any charges made for special services not constituting title insurance, even though performed in connection with a title insurance policy or contract.
 
 
 64
 Id. Sec. 910-1(5).
 
 
 65
 The Pennsylvania Insurance Department has approved Ticor's collectively set rates for charges paid to attorney-agents for title search and examination services, even though the Act requires the Department to reject any filings that do not "meet the requirement of this article." Id. Sec. 910-40(a). No one has ever challenged the Department's regulation of these charges, even though Pennsylvania law entitles any "person aggrieved by any action of the commissioner, except disapproval of a filing or a part thereof," to an administrative hearing. Id. Sec. 910-49(a).
 
 
 66
 Ticor again argues that the definition's exclusion of charges paid to attorneys was intended as a concession to the bar that the state's Insurance Department could not regulate the traditional business of lawyering. For the same reasons as were applicable to New Jersey, the FTC's holding with respect to Pennsylvania cannot stand. Given Pennsylvania's clear intent broadly to regulate the title insurance industry, we believe the Supreme Court of Pennsylvania, which has yet to address the issue, would find Ticor's construction of the definition of "fee" to be reasonable.
 
 
 67
 Since the Act is open to more than one reasonable construction, we believe the Supreme Court of Pennsylvania would defer to the Insurance Department's construction of the Act to permit its regulation of search and examination charges paid to attorney-agents. See Masland v. Bachman, 473 Pa. 280, 374 A.2d 517, 522 (1977) (where specialized agency is entrusted with implementing act, agency's interpretation of act is "entitled to significant weight"); Spicer v. Pennsylvania Dep't of Pub. Welfare, 58 Pa.Cmwlth. 558, 428 A.2d 1008, 1009 (1981) ("It is well settled that the construction of a statute by those charged with its execution and application is entitled to great weight and should not be disregarded or overturned except for cogent reasons, and unless it is clear that such construction is erroneous." (internal quotations omitted)).
 
 
 68
 It is true that prior to 1975 Pennsylvania's Insurance Department did not construe the Act to allow it to regulate charges paid to attorney-agents when acting as title insurance agents. However, the principles of federalism and state sovereignty that underlie the state action doctrine do not permit us to question the merits of the Insurance Department's change in construction where the so-called "new" construction appears on its face to be reasonable.
 
 
 69
 Further, as the opinion in Schwartz explains, see 374 F.Supp. at 577 & n. 16, even if Pennsylvania law did not permit its Insurance Department to regulate these charges as "fees," it seems clear that the Act nevertheless gives the Insurance Department the power to regulate these charges. Finally, Ticor was and is entitled to rely upon the Insurance Department's apparently lawful regulation of these charges and the state action doctrine will immunize its reliance until it becomes clear that the Insurance Department in fact has no authority to regulate title search and examination charges paid to attorney-agents in Pennsylvania.
 
 3.
 
 70
 Therefore, we hold that Ticor has shown that both New Jersey and Pennsylvania have clearly articulated a policy that permits the collective setting of rates for charges paid to attorney-agents for title search and examination services. Since the FTC's complaint counsel stipulated before the ALJ that both New Jersey and Pennsylvania met the second, active supervision prong of the Midcal state action test, we conclude that Ticor's actions in New Jersey and Pennsylvania were immune from antitrust liability under the state action doctrine. Thus, we must grant Ticor's petition for review and vacate the FTC's final order to the extent it applies to Ticor's activities in New Jersey and Pennsylvania.
 
 B.
 
 71
 The FTC held that Arizona, Connecticut, Montana and Wisconsin did not "actively supervise" Ticor's collective setting of rates and thus Ticor failed to satisfy the second prong of the Midcal test as to those four states. The FTC's complaint counsel stipulated before the ALJ that these four states authorized the anticompetitive activity, see Jt.App. at 65, so issues relating to Midcal 's second prong are all that remain before us.
 
 
 72
 The Supreme Court explained the rationale behind the active supervision requirement in Patrick v. Burget, 486 U.S. 94, 108 S.Ct. 1658, 100 L.Ed.2d 83 (1988). It wrote:
 
 
 73
 The active supervision requirement stems from the recognition that "[w]here a private party is engaging in the anticompetitive activity, there is a real danger that he is acting to further his own interests, rather than the governmental interests of the State." Hallie v. Eau Claire, 471 U.S. 34, 47, 105 S.Ct. 1713, 1720, 85 L.Ed.2d 24 (1985); see id., at 45, 105 S.Ct. at 1719-1720 ("A private party ... may be presumed to be acting primarily on his or its own behalf"). The requirement is designed to ensure that the state action doctrine will shelter only the particular anticompetitive acts of private parties that, in the judgment of the State, actually further state regulatory policies. Id., at 46-47, 105 S.Ct. at 1720. To accomplish this purpose, the active supervision requirement mandates that the State exercise ultimate control over the challenged anticompetitive conduct. The mere presence of some state involvement or monitoring does not suffice. The active supervision prong of the Midcal test requires that state officials have and exercise power to review particular anticompetitive acts of private parties and disapprove those that fail to accord with state policy. Absent such a program of supervision, there is no realistic assurance that a private party's anticompetitive conduct promotes state policy, rather than merely the party's individual interests.
 
 
 74
 Id., at 100-01, 108 S.Ct. at 1663 (some citations omitted).
 
 
 75
 In the aftermath of Patrick, it is clear that the active supervision test requires that the state "have and exercise" the power to review the particular anticompetitive acts. The Supreme Court found that state action immunity was not available in Patrick because the state did not "have" the power to supervise the challenged activity. See id., at 102, 108 S.Ct. at 1664.
 
 
 76
 In Midcal and 324 Liquor Corp., the Supreme Court articulated four factors that are pertinent in deciding whether a state actively supervises challenged conduct. They are: (1) whether the state establishes the rates, see 324 Liquor Corp., 479 U.S. at 345, 107 S.Ct. at 726; Midcal, 445 U.S. at 105, 100 S.Ct. at 943; (2) whether the state reviews the reasonableness of the rates, see 479 U.S. at 345, 107 S.Ct. at 726; 445 U.S. at 105, 100 S.Ct. at 943; (3) whether the state monitors market conditions, see 479 U.S. at 345, 107 S.Ct. at 726; 445 U.S. at 106, 100 S.Ct. at 943; and (4) whether the state had engaged in any "pointed reexamination" of its program, see 479 U.S. at 345, 107 S.Ct. at 726; 445 U.S. at 106, 100 S.Ct. at 943.
 
 
 77
 We believe the First Circuit's recent opinion in New England Motor Rate Bureau v. FTC, 908 F.2d 1064 (1st Cir.1990), is most instructive on what type of showing is necessary to satisfy Midcal 's active supervision prong. In New England Motor Rate Bureau, the FTC brought an enforcement action against a private rating bureau whose members were motor carriers. The members of the rating bureau had been collectively setting rates they would charge for transportation within the State of Massachusetts and several other New England states. The only issue before the court was whether Massachusetts actively supervised the motor carriers' collective rate setting so as to satisfy Midcal 's second prong.
 
 
 78
 Massachusetts used a "negative option" approach to regulate rates. Under this approach, filed rates became binding unless the state rejected or suspended the rates within a specified time. While the state had "extensive power to suspend, reject or modify rates," id. at 1065, Massachusetts "ha[d] not in recent history rejected any of the rates ... nor held hearings or investigations." Id.
 
 
 79
 Despite these facts, the First Circuit held that Massachusetts had and exercised the power to review and disapprove of anticompetitive acts that failed to accord with state policy. The court wrote that it was clear that a Massachusetts state agency had plenary power to review and disapprove of filed rates. See id. at 1070. As a result, the court held that the state agency had "the authority to 'review particular anticompetitive acts of private parties and disapprove those that fail to accord with state policy,' " id. at 1071, thus satisfying one of the two parts of the active supervision requirement.
 
 
 80
 Next, the court examined whether Massachusetts "exercised" the power that it "had." Criticizing the FTC's approach as "too demanding in the showing it would require as to the rigor and efficiency of a particular state's regulatory program," id., the court wrote:
 
 
 81
 Where as here the state's program is in place, is staffed and funded, grants to the state officials ample power and the duty to regulate pursuant to declared standards of state policy, is enforceable in the state's courts, and demonstrates some basic level of activity directed towards seeing that the private actors carry out the state's policy and not simply their own policy, more need not be established. Otherwise, the state action doctrine would be turned on its head. Instead of being a doctrine of preemption, allowing room for the state's own action, it would become a means for federal oversight of state officials and their programs.
 
 
 82
 Id.
 
 
 83
 Examining the four factors the Supreme Court mentioned in Midcal and 324 Liquor Corp, the First Circuit noted that the Supreme Court never had written that all four factors must be present before a court can find that active supervision exists. Id. at 1074. In New England Motor Rate Bureau, the court held that the presence of the first two of the four factors, that Massachusetts sets the rates and that the state reviews the reasonableness of the rates, was sufficient to establish the existence of active supervision. In that case, the court found the other two factors, whether the state monitors the market and whether the state has engaged in any "pointed reexamination" of its program, to be absent. Nevertheless, their absence was not fatal to the establishment of active supervision. Id. at 1073.
 
 1.
 
 84
 With respect to Arizona, the FTC held over the dissent of Commissioner Azcuenaga that active supervision of Ticor's collective ratemaking was lacking between 1968 and 1981.[15] In so holding, the FTC reversed the ALJ, who had held that active supervision was present in the state. As the basis of its holding, the FTC found a lack of active supervision because Ticor's 1968 filing went into effect essentially unreviewed and because Arizona's Insurance Department failed to undertake a formal examination of the rating bureau even though an Arizona statute permitted such an examination. In Arizona, Ticor collectively set its rates through the Title Insurance Rating Bureau of Arizona, a private organization comprised of title insurance companies.
 
 
 85
 Our first inquiry is to determine whether Arizona "had" the power to regulate Ticor's collective ratemaking. It is clear the answer to this first inquiry is "yes." State law required Arizona's state-run Insurance Department to make sure that all rate bureau filings complied with the statutory requirement that rates not be excessive, inadequate or unfairly discriminatory. See Ariz.Rev.Stat.Ann. Secs. 20-375(A) & 20-376(D). State law also required title insurers to provide with their rate filings a statement justifying the rates. See id. Sec. 20-377. Finally, the state's Insurance Department was required to reject any rates if they did not meet the statutory criteria. See id. Sec. 20-378(A).
 
 
 86
 Next, we must examine whether Arizona "exercised" its power to regulate Ticor's collective ratemaking. We believe the First Circuit undertook the proper inquiry in New England Motor Rate Bureau. Thus, we will examine whether Arizona's program of supervision was in place, was staffed and funded, had granted to the state officials ample power and the duty to regulate pursuant to declared standards of state policy, was enforceable in the state's courts, and had demonstrated some basic level of activity directed towards seeing that the private actors carry out the state's policy and not simply their own policy. If so, "more need not be established." New England Motor Rate Bureau, 908 F.2d at 1071.
 
 
 87
 The facts before us demonstrate that Arizona's program of supervision was in place between 1968 and 1981. See Jt.App. at 81. Further, there is every indication that Arizona's Insurance Department was staffed and funded during this period. Next, as we have already seen, the Arizona legislature granted the Insurance Department ample power and the duty to enforce the law pursuant to the legislative standards. This duty was enforceable in Arizona's state courts. See Industrial Dev. Auth. of the County of Pinal v. Nelson, 109 Ariz. 368, 509 P.2d 705, 714 (1973) (action for a writ of mandamus is available to compel a public official to perform his duty).
 
 
 88
 Finally, the record demonstrates that the Insurance Department engaged in some basic level of activity directed at ensuring that Ticor carried out the state's policy and not simply its own. Following Ticor's rate filing in 1968, the Arizona Insurance Department sought information as to how a component of the rates was derived. The chief deputy director of Arizona's Insurance Department testified that every filing submitted from 1973 to 1982 "was examined to see if it met the statutory requirements. It was scrutinized and it was either approved or disapproved. There would sometimes be situations where more information was needed and once that was obtained and [the filing] met the requirements, it would be approved." Jt.App. at 1153. The ALJ found that no filing went into effect in Arizona until the director of the Insurance Department marked the filing "approved." Jt.App. at 80.
 
 
 89
 Turning next to the four factors the Supreme Court discussed in Midcal and 324 Liquor Corp, it is clear that Arizona has the final word in setting title insurance rates. These rates must be filed with the Insurance Department, and they cannot go into effect if the Insurance Department suspends or rejects them. It is also clear that Arizona has reviewed the reasonableness of the title insurance rates. The record before us does not show whether Arizona's Insurance Department in fact monitors market conditions. The record does show that Arizona has not undertaken a "pointed reexamination" of its program. As the First Circuit held in New England Motor Rate Bureau, we hold that the absence of the final two Midcal and 324 Liquor Corp. factors is not fatal to Ticor's state action defense.
 
 
 90
 The FTC erred when it held that Ticor failed to show that Arizona actively supervised its collective filing of rates. Arizona both had and exercised the power to ensure that Ticor's rates complied with the policy that state has articulated.
 
 
 91
 The root of the FTC's error and its explanation seem to lie in its insistence on sitting "in judgment upon the degree of strictness or effectiveness with which a state carries out its own statutes." New England Motor Rate Bureau, 908 F.2d at 1076 (emphasis in original). As in that case, the FTC here takes the position "that the 'active supervision' prong necessitates an inquiry by the FTC into whether a particular state's regulatory operation demonstrates satisfactory zeal and aggressiveness. The FTC would, in effect, try the state regulator." Id. at 1075. We agree with the First Circuit's conclusion that "this goes too far." Id.
 
 2.
 
 92
 With respect to Connecticut, the FTC over Commissioner Azcuenaga's dissent held that no active state supervision was present. The FTC's holding affirmed the ALJ's conclusion that active supervision was lacking in Connecticut. The FTC did not find active supervision in Connecticut because it believed that the state failed meaningfully to regulate the level of agency commissions, over which the insurance companies had no control. We disagree with the FTC's holding.
 
 
 93
 Our first inquiry is whether Connecticut officials had the authority to supervise Ticor's collective filing of rates. As with Arizona, it is clear the answer is "yes." State law required Connecticut's state-run Insurance Department to make sure that all rate bureau filings complied with the statutory requirement that rates not be excessive, inadequate or unfairly discriminatory. See Conn.Gen.Stat.Ann. Sec. 38-201x(b)(2) (West 1987). State law also required title insurers to provide with their rate filings a statement justifying the rates. See id. Sec. 38-201x(a)(2). Finally, the state's Insurance Department was required to reject any rates if they did not meet the statutory criteria. See id. Sec. 38-201p(b).
 
 
 94
 Next, we review whether Connecticut "exercised" the authority it had to supervise Ticor's collective filing of rates. The record shows that Connecticut's program of supervision was in place during the relevant time and that it was staffed and funded. Connecticut granted to its state officials ample power and the duty to regulate pursuant to declared standards of state policy. This duty was enforceable in the state's courts. See Beccia v. City of Waterbury, 185 Conn. 445, 441 A.2d 131, 136 (1981) (action for a writ of mandamus is available to compel a public official to perform his duty).
 
 
 95
 Further, Connecticut's Insurance Department demonstrated some basic level of activity directed towards seeing that the private actors carried out the state's policy and not simply their own policy. Following Ticor's 1966 rate filing, the state's Insurance Department requested justification for the premium fee. See Jt.App. at 71. The Insurance Department later approved the 1966 rate filing. See id. Ticor's second collective filing in Connecticut occurred in 1981. It is clear that the Insurance Department read the filing and approved it. Ticor's final collective filing in Connecticut took place in 1983. The Insurance Department approved the 1983 filing, even though Ticor had yet to supply supporting data. A Connecticut regulator testified that the state's Insurance Department "reviews every filing that we receive." Jt.App. at 1218. Just as with Arizona, Connecticut satisfied the first two of the four Midcal and 324 Liquor Corp. factors. For these reasons, Ticor has established that Connecticut exercised its power to control Ticor's collective rate setting activity in that state.
 
 
 96
 The basis of the FTC's contrary holding is its finding that Connecticut failed "meaningfully" to regulate the levels of agent commissions, which Commissioner Strenio, the author of the FTC's majority opinion, described as excessively high in his separate supplemental statement. See Jt.App. at 195. This description is telling. The FTC's analysis is inconsistent with the principles that inform the state action doctrine. State action immunity is available not only when a state acts wisely; instead, the wisdom of a state's policy is immaterial. As the Supreme Court has written, state action immunity is available wherever a state clearly articulates and actively supervises a policy that will displace competition.
 
 3.
 
 97
 In Montana, the private rating bureau Ticor belonged to received its license in 1982 and ceased to exist in 1984. Its only major rate filing occurred in February, 1983. The ALJ found that active state supervision existed in Montana. The FTC disagreed, holding that the 1983 filing went into effect without any state review.
 
 
 98
 Once again, we begin by asking whether Montana's officials had the authority to supervise Ticor's collective filing of rates. As with Arizona and Connecticut, it is clear the answer is "yes." State law required Montana's state-run Insurance Department to make sure that all rate bureau filings complied with the statutory requirement that rates not be excessive, inadequate or unfairly discriminatory. See Mont.Code Ann. Secs. 33-1-311 & 33-16-201. State law also required title insurers to provide with their rate filings a statement justifying the rates. See id. Sec. 33-16-203. Finally, the state's Insurance Department was required to reject any rates if they did not meet the statutory criteria. See id. Secs. 33-16-204 to 33-16-206, 33-16-211. This is sufficient to establish that Montana's Insurance Department had the power to supervise Ticor's collective filings of title search and examination charges.
 
 
 99
 Next, we review whether Montana "exercised" the authority it had to supervise Ticor's collective filing of rates. The record shows that Montana's program of supervision was in place during the relevant time and that it was staffed and funded. Montana granted to its state officials ample power and the duty to regulate pursuant to declared standards of state policy. This duty was enforceable in the state's courts. See Jeppeson v. Montana, Dep't of State Lands, 205 Mont. 282, 667 P.2d 428, 431 (Mont.1983) (action for a writ of mandamus is available to compel a public official to perform his duty (quoting Mont.Code Ann. Sec. 27-26-102(1)).
 
 
 100
 Further, Montana's Insurance Department demonstrated some basic level of activity directed towards seeing that the private actors carried out the state's policy and not simply their own policy. Ticor supported its 1983 filing with a five page single-spaced cover letter. See Jt.App. at 500-04. Following the filing, someone from Ticor's rating bureau met with officials of Montana's Insurance Department. See id. at 90. The state officials told Ticor's representative that the increase would go into effect immediately and approved the filing. See id. However, the state officials requested additional supporting data.[16] See id. Just as with Arizona and Connecticut, Montana satisfied the first two of the four Midcal and 324 Liquor Corp. factors. For these reasons, Ticor has established that Montana exercised its power to control Ticor's collective rate setting activity in that state.
 
 
 101
 The FTC's conclusion was based upon its belief that Montana did not do enough to confer state action immunity upon Ticor. To the contrary, we believe that while the quality of Montana's actions may deserve the criticism that the FTC levels, the quantity of Montana's actions are sufficient to allow Ticor to invoke the state action doctrine.
 
 4.
 
 102
 In Wisconsin, the rate bureau Ticor belonged to submitted general rate filings in 1971, 1981 and 1982. The ALJ held that there was no active state supervision in Wisconsin. The FTC affirmed.
 
 
 103
 Again, we first examine whether state officials in Wisconsin had the power to regulate Ticor's collective filing of rates for title search and examination services. As with Arizona, Connecticut and Montana, it is clear the answer is "yes." State law required Wisconsin's state-run Insurance Department to make sure that all rate bureau filings complied with the statutory requirement that rates not be excessive, inadequate or unfairly discriminatory. See Wisc.Stat.Ann. Sec. 625.11(1). State law also required title insurers to provide with their rate filings a statement justifying the rates. See id. Sec. 625.13. Finally, the state's Insurance Department was required to reject rates following a hearing if they do not meet the statutory criteria. See id. Sec. 625.22. This is sufficient to establish that Wisconsin's Insurance Department had the power to supervise Ticor's collective filings of title search and examination charges.
 
 
 104
 Next, we review whether Wisconsin "exercised" the authority it had to supervise Ticor's collective filing of rates. The record shows that Wisconsin's program of supervision was in place during the relevant time and that it was staffed and funded. Wisconsin granted to its state officials ample power and the duty to regulate pursuant to declared standards of state policy. This duty was enforceable in the state's courts. See Law Enforcement Standards Bd. v. Village of Lyndon Station, 101 Wis.2d 472, 305 N.W.2d 89, 99-100 (1981) (" 'Mandamus is the proper remedy to compel public officers to perform duties arising out of their office and presently due to be performed.' ").
 
 
 105
 Further, Wisconsin's Insurance Department demonstrated some basic level of activity directed towards seeing that Ticor carried out the state's policy and not simply its own policy. Wisconsin's Insurance Department raised questions regarding the 1971 filing and later ruled that it was acceptable. The Insurance Department checked the 1981 filing for accuracy. The 1982 filing also received some review from Insurance Department. Just as with Arizona, Connecticut and Montana, Wisconsin satisfied the first two of the four Midcal and 324 Liquor Corp. factors. For these reasons, Ticor has established that Wisconsin exercised its power to control Ticor's collective rate setting activity in that state.
 
 5.
 
 106
 The FTC held that Arizona, Connecticut, Montana and Wisconsin failed Midcal 's adequate supervision prong because the regulators in those states were unqualified, they approved rates that the FTC's commissioners would not have approved and they generally did not regulate to the degree that the FTC found desirable. Even if the FTC is correct, its conclusions miss the point. Availability of the state action doctrine does not depend upon the quality of state supervision. The principles of federalism and state sovereignty that undergird the doctrine prohibit its selective application only where states act in a manner that a federal agency or federal court finds to be preferable. Instead, the state action doctrine recognizes that states can implement anticompetitive policies, even policies that depend upon private actors such as Ticor, free from federal supervision where the state clearly articulates and actively supervises the policy.
 
 
 107
 The FTC's complaint counsel stipulated that Arizona, Connecticut, Montana and Wisconsin clearly articulated the anticompetitive policies at issue here. We have held that these states actively supervised those same anticompetitive policies. Thus, Ticor's setting of collective rates for title search and examination services in these four states is immune from antitrust liability. We therefore must vacate the remainder of the FTC's final order.[17]
 
 V.
 
 108
 Accordingly, we hold that Ticor's collective setting of rates charged for title search and examination services in Arizona, Connecticut, New Jersey, Pennsylvania, Montana and Wisconsin is immune from antitrust liability under the state action doctrine. As a result, the FTC lacked jurisdiction to bring an enforcement action against Ticor. We will thus grant Ticor's petition for review and vacate the FTC's final order in its entirety.SUR PETITION FOR REHEARING
 
 
 109
 March 12, 1991.
 
 
 110
 PRESENT: SLOVITER, Chief Judge, BECKER, STAPLETON, MANSMANN, GREENBERG, HUTCHINSON, SCIRICA, COWEN, NYGAARD and ALITO, Circuit Judges, and RE, Judge*.
 
 
 111
 The petition for rehearing filed by respondent in the above captioned matter having been submitted to the judges who participated in the decision of this court and to all the other available circuit judges of the circuit in regular active service, and no judge who concurred in the decision having asked for rehearing, and a majority of the circuit judges of the circuit in regular active service not having voted for rehearing by the court in banc, the petition for rehearing is denied
 
 
 112
 Chief Judge Sloviter, Judge Becker and Judge Scirica would grant rehearing.
 
 
 
 *
 Hon. Edward D. Re, Chief Judge of the United States Court of International Trade, sitting by designation
 
 
 [1]
 In 1985, Ticor filed suit against the FTC in the United States District Court for the District of Columbia challenging the prosecution of this action solely on grounds that the FTC was unconstitutionally exercising executive branch authority in violation of the principle of separation of powers. The district court dismissed the challenge as unripe since the FTC had yet to take final action. See Ticor Title Ins. Co. v. FTC, 625 F.Supp. 747 (D.D.C.1986), aff'd, 814 F.2d 731 (D.C.Cir.1987). While the court of appeals affirmed the district court's dismissal of the constitutional challenge, the three judges on its panel wrote separate opinions, no one of which garnered a majority, concerning whether the district court's dismissal was justified by a failure to exhaust administrative remedies, a lack of final agency action or a lack of ripeness. See Ticor, 814 F.2d 731
 
 
 [2]
 One of the six original respondents, First American Title Insurance Company, settled the charges against it in a consent agreement with the FTC. See In re Ticor Title Ins. Co., No. 9190 (July 30, 1987) (LEXIS, Trade library, FTC file). Thus, the FTC's final order affected only five title insurance companies, all of whom have joined as petitioners before this Court
 
 
 [3]
 In the weeks following the FTC's initiation of this action in 1985, thirteen class action suits were filed against the insurance companies. The suits were consolidated for pretrial purposes and were settled in a judgment entered in June of 1986. Two state court challenges to the settlement judgment are pending, one in Arizona and one in Wisconsin
 
 
 [4]
 The initial complaint also challenged the insurers' collective formulation and filing of charges for settlement and escrow services. The FTC, in its final order, dismissed these portions of the complaint since the FTC's complaint counsel failed to develop a record sufficient to sustain the charges. Thus, the final order only affects the insurers' collectively set rates for title search and examination services
 
 
 [5]
 The "state action" doctrine protects private price-fixing if such conduct is (1) undertaken pursuant to a clearly articulated and affirmatively expressed state policy to displace competition with regulation and (2) the state itself actively supervises the conduct. See California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc., 445 U.S. 97, 105, 100 S.Ct. 937, 943, 63 L.Ed.2d 233 (1980)
 The original complaint challenged joint price-setting in thirteen states. The insurers raised the state action defense with respect to twelve of these thirteen states. Following the Supreme Court's decision in Southern Motor Carriers Rate Conference, Inc. v. United States, 471 U.S. 48, 105 S.Ct. 1721, 85 L.Ed.2d 36 (1985), the FTC's complaint counsel declined to pursue charges concerning five of the thirteen states.
 The issues tried before the ALJ relating to the state action defense were: (1) in New Jersey and Pennsylvania, did the states authorize joint rate-setting of title search and examination charges for attorney-agents and (2) in Arizona, Connecticut, Idaho, Montana, Ohio and Wisconsin, was there active state supervision.
 
 
 [6]
 The FTC's full compliment of commissioners is five. Commissioner Machol did not participate in the decision that resulted in the final order in this matter. Furthermore, Commission Chairman Steiger did not participate in the decision leading to the final order because she took her post after the FTC reached its decision but before the decision was issued. Chairman Steiger's predecessor, Chairman Oliver, "[p]rior to leaving the Commission ... registered his vote in the affirmative for the Final Order and the Opinion of the Commission in this matter." Joint Appendix (Jt.App.) at 126 n*
 
 
 [7]
 Commissioner Calvani dissented as to this conclusion. In its amicus brief filed in support of the insurers, the Pennsylvania Insurance Department, which is the state executive branch agency responsible for the execution and enforcement of all Pennsylvania insurance laws, also disagrees with this conclusion so far as it construes the law of Pennsylvania
 
 
 [8]
 Commissioner Azcuenaga partially dissented from this holding, concluding instead that Arizona and Connecticut did actively supervise the insurers' rate-setting activities
 
 
 [9]
 This proviso, of course, merely restates the requirements of the state action doctrine. See supra note 5
 
 
 [10]
 This description is based on the excellent survey of this area that the ALJ compiled in his opinion. See Jt.App. at 32-60
 
 
 [11]
 While the FTC issued its decision on September 19, 1989, the sixty days within which to petition for review of the decision did not begin to run until the FTC served its decision upon the insurers on October 20, 1989
 
 
 [12]
 The Court held that a municipality, in order to qualify for state action immunity, need not satisfy the second prong of the Midcal test, which requires that the state actively supervise the anticompetitive conduct. See Hallie, 471 U.S. at 46-47, 105 S.Ct. at 1720; see also Hancock Indus. v. Schaeffer, 811 F.2d 225, 235 (3d Cir.1987) ("In Hallie, the Court concluded that the second element of the Midcal analysis did not apply when a municipality was the decisionmaker.")
 
 
 [13]
 The word "them" in the Act's definition of "fee" lacks an antecedent. However, reference to the immediately preceding definition, which explains the meaning of the term "premium," sheds light on this problem. Section 17:46B-1(e) states:
 "Premium" for title insurance means that portion of the fee charged by a title insurance company, agent of a title insurance company or approved attorney of a title insurance company, or any of them, to an insured or to an applicant for insurance, for the assumption by the title insurance company of the risk created by the issuance of the title insurance policy.
 N.J.Stat.Ann. Sec. 17:46B-1(e).
 
 
 [14]
 The Act also provides any aggrieved person with the ability to challenge any of the Commissioner's actions. See N.J.Stat.Ann. Sec. 17:46B-52. The FTC has failed to bring to our attention any state challenge to the Commissioner's approval of collectively set rates that attorney-agents charge for search and examination services
 
 
 [15]
 Arizona's rating bureau went out of business for all purposes on December 16, 1981. See Jt.App. at 83. Arizona revoked the rating bureau's corporate charter on October 1, 1983. See id
 
 
 [16]
 There is no evidence that Ticor ever supplied this supporting data. See Jt.App. at 90
 
 
 [17]
 Because we hold that Ticor's setting of collective rates for search and examinations services in all six states is immune from antitrust liability under the state action doctrine, it is unnecessary to consider whether the same activity is also exempt from antitrust regulation under the McCarran-Ferguson Act as the business of insurance or is exempt from antitrust regulation as protected petitioning of state regulators under the Noerr-Pennington doctrine. See, e.g., Southern Motor Carriers Rate Conference, 471 U.S. at 55 n. 17, 105 S.Ct. at 1725 n. 17 (1985) (finding of state action immunity "makes it unnecessary to consider the applicability of [the Noerr-Pennington ] doctrine to the petitioners' collective ratemaking activities.")
 Furthermore, we decline to address Ticor's separation of powers argument. This is an attack on the administrative state. Whatever the merits of such an attack, Ticor has failed to present us with a fully developed argument; its argument that we should hold that the FTC operates in violation of the principle of separation of powers since it performs an executive function and yet is not subject to executive branch control is cursory at best, taking up less than two pages of its brief. As the Seventh Circuit wrote in a similar situation, "Brevity may be the soul of wit, but seismic constitutional change is not a laughing matter." See Hospital Corp. of Am. v. FTC, 807 F.2d 1381, 1392 (7th Cir.1986), cert. denied, 481 U.S. 1038, 107 S.Ct. 1975, 95 L.Ed.2d 815 (1987).
 
 
 *
 Hon. Edward D. Re, Chief Judge of the United States Court of International Trade, sitting by designation. Judge Re was limited to voting for panel rehearing